JUNE MELODY BALLANCE, A MINOR v. DR. IRL J. WENTZ, DR. J. R. DINEEN AND NEW HANOVER MEMORIAL HOSPITAL, INC.

No. 61

(Filed 30 December 1974)

1. **Physicians and Surgeons § 17— negligence in installing traction — insufficiency of evidence**

   In an action based on negligence of defendant physicians and defendant hospital in the installation and maintenance of a traction rig on plaintiff's broken arm which collapsed and allegedly caused a refracture, plaintiff's evidence was insufficient for the jury where there was a total absence of expert or other testimony that the procedure in attaching the traction rig was other than in strict conformity with approved medical and surgical practice.

2. **Rules of Civil Procedure § 43; Witnesses § 4— adverse party called as witness — impeachment**

   Under G.S. 1A-1, Rule 43(b), a defendant called by plaintiff as her witness could be impeached by a letter written by such defendant.

3. **Physicians and Surgeons § 15— necessity for expert testimony**

   In cases of diseases or injuries with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence.

   Chief Justice BOBBITT not sitting.

ON appeal from the decision of the North Carolina Court of Appeals affirming the judgment of *Peel, J.,* entered in the Superior Court of NEW HANOVER County, September 4, 1973 Session, allowing defendants' motions for directed verdicts and dismissing the action. On the basis of Judge Carson's dissent, the plaintiff brought the case here for further review.

In material part, the complaint alleged:

"VII. That on or about October 15, 1969, the minor plaintiff, June Melody Ballance, suffered a fracture, with displacement, of her upper right arm and was admitted as an in-patient in the corporate defendant's hospital under the care and treatment of the defendants; that the fracture was treated by traction.

"VIII. That on or about the 2nd day of November, 1969, while the minor plaintiff was still hospitalized at the hospital under the care and treatment of the defendants and their staffs and while the minor plaintiff's right arm was in traction, and after the fracture of the right arm

had properly relocated and was properly healing, the traction apparatus broke or came loose causing the minor plaintiff to suffer a refracture with displacement of the right arm.

"IX. That the defendants and their agents were careless and negligent in that:

    (1) They failed to properly place the arm in traction and failed to install the traction so that it would not break or come loose from the arm;

    (2) They failed to maintain proper care and supervision over the traction and the arm;

    (3) They neglected to take necessary steps to correct defects in the traction after being warned that the traction was coming loose; and

    (4) They taped the arm of the plaintiff to the traction in a negligent and careless manner.

"X. That the joint and concurrent negligence of the defendants and their staffs was the proximate cause of the injury to the plaintiff as herein stated.

"XI. That, as a result of the carelessness and negligence of the defendants and their agents, and, as a result of the arm falling from traction, surgery had to be performed on the plaintiff, leaving the plaintiff with a permanent and extremely noticeable scar, additional hospitalization and hospital and medical expenses were required, the plaintiff had to and will have to suffer severe pain which she would not otherwise have had to suffer, the plaintiff has and will suffer extreme embarrassment and mental anguish from the scar for the remainder of her life and her suffered damages are in the amount of $45,000.00."

The defendants, by answer, denied allegations of the complaint Nos. VIII through XI, and moved to dismiss under Rule 50 upon the ground the plaintiff had failed to state any claim upon which relief may be granted.

The plaintiff offered defendant Dr. Wentz as her principal witness. Dr. Wentz testified that on October 15, 1969, he undertook the treatment of the plaintiff's injuries.

" . . . I made a diagnosis based upon her complaints and my findings in the x-rays. My diagnosis at that time was that she had a severe fracture with displacement upper shaft of the humerus, right shoulder. The humerus is the tubular bone that articulates with the shoulder bone. The fracture was near the shoulder joint. The distal or far end of the fracture was jammed up into the axillary aspect of the joint.

\* \* \* \* \* \*

"After I rendered my diagnosis, I recommended that skeletal traction be utilized by placing a steinmann pin through the ulna. That is, through the skin on one side and out the skin on the other side so that we could apply a traction bow instrument used to attach to a pin while it is through a bone. When I say the ulna, I am talking about the ulna as it nears the shoulder joint. The pin which I have described goes into the elbow joint both from outside to inside and from inside to outside. I had protrusion of this pin on either side. This was done under local anesthesia, using a drill. The pin had small threads so that you can put it in by drilling. This was done in the emergency room.

"After this was done, she was put in a hospital bed, the traction was rigged. In other words, we attached a rope to the traction bow and the rope went through some pulleys and a weight was attached to the pin, to the rope leading from the pin. We also applied some other traction material to the forearm. This material is a sticky, porous type bandage that sticks very readily to the skin and is wrapped with an elastic bandage to help hold it in place. Through this traction bandage another rope is attached again to other pulleys and a much lesser amount of weight is attached simply to keep the arm upright. In the neighborhood of two pounds is attached."

The rig with the heavy weight was attached by a pin through the bone and by traction (and continuing pull) was intended to restore contact between the ends of the bone so that the healing process would leave the arm straight and the broken ends in proper contact. The rig with the small weight was attached by adhesive tape and elastic bandages around the arm to keep the arm elevated for the patient's comfort and to prevent any rotating movement.

Ballance v. Wentz

The plaintiff testified that on Sunday morning, November 2nd, while she was eating breakfast and was in a turned position in bed, the traction fell. The collapse resulted from the failure of the adhesive tape and the elastic bandage around her arm to support the light weight. When the bandage gave way, the arm fell across her body. "I did experience pain in my arm. It hurt terribly. . . . [A]fter I got it back in the position it was before, it did not hurt as much but it did hurt a little bit."

A few days before the light rig collapsed, the adhesive tape holding the attachment to the arm became loose. When this was called to the attention of the nurse, new tape was attached. Dr. Wentz examined the repairs. "I believe I rewrapped the elastic bandage on one occasion. . . . This would have been about five days before we took it off."

The evidence disclosed that after the rigs were installed, the many x-ray pictures taken were made by a portable x-ray machine. The patient, because of the rigs, could not be moved through the door of her hospital room. As a result of the plaintiff's position in bed and the manner in which the rigs were set up, the portable x-ray machine was used, showing the alignment at the point of the fracture to be good. However, what the film did not show was that at the point of the fracture, viewed from different angles, the connection was not good.

The plaintiff contends the defendants were negligent in failing to attach and maintain the light rig on the plaintiff's broken arm and as a result of such negligence the rig gave way causing a fracture at the point of the original break. By her pleadings, the right to recover in this action required her to offer evidence sufficient to permit a legitimate inference that the light or auxiliary rig was negligently installed and maintained and as a result of its collapse, there was a refracture of the bone at the place of the original break.

The defendants contend the light rig was not negligently installed and its collapse did not result in a refracture and did not have any adverse effect on the bone alignment or the healing process. The x-ray pictures taken on October 29th before the rig collapsed and on November 3rd after the collapse, disclosed that there was no refracture and no change in the bone alignment. These x-rays were introduced in evidence. The discovery that the bone contact was only partial and not complete was made only after the patient was taken to the x-ray room where

photographs of the break could be taken from different angles. These disclosed the misalignment necessitating the November 5, 1969 operation. That operation, according to the testimony of Dr. Wentz, clearly showed there had been no refracture. It was stipulated and agreed between the parties that Dr. Wentz is a medical expert specializing in the field or orthopedic surgery.

The plaintiff's witness Dr. Dorman, also a specialist in orthopedics, in answer to a hypothetical question stated that the collapse of the light rig could, or might have caused a refracture. The hypothetical question failed to include the pertinent fact testified to by Dr. Wentz, corroborated by the operation, that the original fracture had healed sufficiently to make it necessary for him to use a hammer and cutting instruments to disconnect that part of the fracture where the broken ends had been in contact and had partially healed, though out of alignment. When Dr. Wentz's testimony about the partial healing of the break was called to Dr. Dorman's attention, he answered that if there was a partial healing, he would say that the collapse of the rig did not cause any refracture.

The plaintiff sought to connect the collapse of the rig and a refracture by Exhibit No. 27, a letter written by Dr. Wentz on July 22, 1970, stating that in his operation of November 5, 1969, he "was . . . surprised to see that a complete separation of this healing fracture had occurred . . . . I think that we cannot be certain as to when fracture position was lost. It could have occurred when the skin traction slipped off . . . . " On cross-examination Dr. Wentz testified: "The letter has some erroneous portions. This letter was dictated a year after surgery and I had the impression that this fracture had slipped or rotated when I saw the x-ray on November 3, 1969. [The x-ray taken in the x-ray room where full exposure was permitted.] At that time of the operation, I found that the fracture had not slipped. It was indeed quite firmly attached in a side-to-side position, and the fracture had to be disrupted using a sharp, strong instrument, and this time including a hammer to relocate . . . the fractured ends." This letter was written without review of the many x-ray pictures taken during the treatment. "In my opinion, there was not time between November 2, 1969, the date the traction is alleged to have slipped, and November 5, 1969, the date I performed the operation for the callous that I found to have formed." The letter stated: "Callous representing healing was present on 10-29-69."

At the close of the evidence, Judge Peel ruled as a matter of law that the plaintiff's evidence, considered in the light most favorable to her, was insufficient to raise a jury question and summary judgment was entered dismissing the action.

On plaintiff's appeal, the Court of Appeals by a vote of two to one, affirmed the judgment of the superior court. By reason of Judge Carson's dissent, the plaintiff has brought the case here for our further review.

*Chambliss, Paderick, Warrick & Johnson, P.A. by Joseph B. Chambliss for plaintiff appellant.*

*Poisson, Barnhill & Butler by M. V. Barnhill, Jr., for defendants Dr. Irl J. Wentz & Dr. J. R. Dineen.*

*Hogue, Hill, Jones, Nash & Lynch by William L. Hill II for defendant New Hanover Memorial Hospital, Inc.*

HIGGINS, Justice.

In order to make out her case, the plaintiff was required to offer competent evidence sufficient to permit the jury to make legitimate findings: (1) The defendants negligently failed properly to install and to maintain the small or auxiliary rig attached to plaintiff's arm; (2) the failure resulted in the rig's collapse; (3) the collapse caused a refracture of the bone in the arm; (4) the plaintiff suffered damages as a result of the negligence. A failure to establish any link in the above chain would break continuity and would be sufficient legal ground to defeat plaintiff's claim and to require the court to sustain the motion to dismiss.

All the evidence came from the witnesses called by the plaintiff. Dr. Wentz, a defendant, testified describing the diagnosis, operation, treatment, and the installation and purpose of two rigs designed to aid in restoring and keeping proper bone alignment. He identified x-ray photographs taken four days before and three days after the small rig collapsed. These photographs showed there was no change in the bone position at the point of the break between the dates October 29th and November 5th. He testified unequivocally that at the time he performed the operation on the latter date, he found the broken ends of the bone, though out of exact alignment, had healed to the extent that he was required to use heavy instruments, including a hammer, to separate the joinder in order that he might re-

position the ends of the bone, restoring proper alignment. He testified that in the diagnosis and treatment he followed approved medical and surgical procedures.

There is a total absence of expert or other testimony that the procedure followed in attaching the light rig to the patient's arm was other than in strict conformity with approved medical and surgical practice. There was evidence the adhesive tape which held the light rig, after several days, began to come loose from the skin. When this fact was called to the attention of the nurse, she applied additional tape. Dr. Wentz checked and rewound the elastic bandage after the repairs were made by the nurse. Thereafter, the weight, though light, caused the bandage to break loose from the arm resulting in the collapse. A showing the rig collapsed is not enough to show negligence. Something more must be shown before negligence may be inferred. *Boyd v. Kistler,* 270 N.C. 744, 155 S.E. 2d 208; *Galloway v. Lawrence,* 266 N.C. 245, 145 S.E. 2d 861; *Hunt v. Bradshaw,* 242 N.C. 517, 88 S.E. 2d 762; *Hawkins v. McCain,* 239 N.C. 160, 79 S.E. 2d 493.

Plaintiff argues she has offered sufficient evidence to justify the jury in finding the collapse of the rig caused a refracture, notwithstanding the testimony of Dr. Wentz to the contrary. In support of her contention, her counsel produced and Dr. Wentz identified a letter he wrote on July 22, 1970. The letter stated: "I . . . was, of course, surprised to see that a complete separation of this healing fracture had occurred, making it mandatory that some surgical treatment be instituted. . . . In summary, I think that we cannot be certain as to when fracture position was lost. It could have occurred when the skin traction slipped off . . . . " The letter was introduced as plaintiff's Exhibit No. 27.

On cross-examination, Dr. Wentz by way of explanation testified: "The letter has some erroneous portions. This letter was dictated a year after surgery and I had the impression that this fracture had slipped or rotated when I saw the x-ray on November 3, 1969. At that time of the operation, I found that the fracture had not slipped. It was indeed quite firmly attached in a side-to-side position, and the fracture had to be disrupted using a sharp, strong instrument, and this time including a hammer . . . . It had to be disrupted to relocate the fractured ends, and then put them in a better position, using a Rush pin. . . . The terms that I used in this letter, including the term 'complete

separation of this healing fracture,' I will repudiate at this time. . . . Yes, I would also repudiate the statement 'In summary, I think that we cannot be certain as to when fracture position was lost.' "

In a further effort to show the collapse caused a refracture the plaintiff called Dr. Dorman, also a qualified expert in orthopedics. In answer to a hypothetical question, Dr. Dorman stated that the collapse of the rig could, or might have caused a refracture. However, when the extent of the healing process disclosed by the x-rays and the operation was included in the question, Dr. Dorman said that his opinion would be the collapse did not cause a refracture.

[1] The plaintiff was without expert or other testimony showing negligence in installing or maintaining the light rig. All the testimony was to the contrary. All the damages and all liability alleged in the complaint are grounded on negligence in the installation and maintenance of the auxiliary rig resulting in a refracture. "A party is bound by his pleadings and, unless withdrawn, amended, or otherwise altered, the allegations contained in all pleadings ordinarily are conclusive as against the pleader." *Davis v. Rigsby*, 261 N.C. 684, 136 S.E. 2d 33. Rule 15(b), Rules of Civil Procedure is inapplicable in this case. Here the pleadings specifically raise the issues. *Roberts v. Memorial Park*, 281 N.C. 48, 187 S.E. 2d 721.

[2] Prior to the adoption of the new Rules of Civil Procedure, the plaintiff would have been precluded from offering Exhibit No. 27 for the purpose of impeaching the testimony of her witness Dr. Wentz. The old rule is stated in 7 Strong N. C. Index 2d, Witnesses, § 4, page 694: "Since a party calling and examining a witness represents him to be worthy of belief, he may not impeach the credibility of such witness, even though the witness is the adverse party." *Powell v. Cross*, 263 N.C. 764, 140 S.E. 2d 393. However, the new Rules of Civil Procedure have made significant changes. Rule No. 43(b) provides: *"Examination of hostile witnesses and adverse parties.*—A party may interrogate any unwilling or hostile witness by leading questions and may contradict and impeach him in all respects as if he had been called by the adverse party."

Under the new rule, Dr. Wentz, though called by the plaintiff as her witness, nevertheless may be impeached by his letter. Apparently the letter could be treated as an admission against

interest. *Board of Education v. Lamm,* 276 N.C. 487, 173 S.E. 2d 281.

Even if it be found the letter (Exhibit No. 27) is an admission against interest, nevertheless the letter in no wise suggests there was negligence in the use or maintenance of the light rig, causing its collapse. A showing of negligence in such matters was vital to the plaintiff's case. By failure to show the negligence alleged in the complaint, the plaintiff has failed to carry the burden of proof.

The judgment in the superior court and the decision of the Court of Appeals are supported by the record and are in accordance with our case law. This conclusion is sustained by the following and many other authoritative decisions of this Court. In the light of the pleadings, the evidence, and the principles of law hereinafter discussed, no issue of fact triable by a jury was presented. Hence, Judge Peel was required to grant defendants' motion to dismiss. *Cutts v. Casey,* 278 N.C. 390, 180 S.E. 2d 297; Rule 50(a), Rules of Civil Procedure, G.S. 1A-1.

[3] In this, as in all cases involving negligent failure of the surgeon or physician to render professional treatment for diseases or injuries, the plaintiff cannot rely on common knowledge or lay testimony to make out a case for the jury. In cases of diseases or injuries "with respect to which a layman can have no knowledge at all, the court and the jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of. it proper to be submitted to the jury." *Smith v. Wharton,* 199 N.C. 246, 154 S.E. 12.

"Thus, it is not enough to absolve the physician from liability that he possesses the required professional knowledge and skill. He must exercise reasonable diligence in the application of that knowledge and skill to the particular patient's case and give to the patient such attention as the case requires from time to time. *Galloway v. Lawrence, supra.* On the other hand, a qualified physician, who forms his judgment after a careful and proper examination or investigation of the particular patient's condition, is not an insurer of his diagnosis or of the success of his treatment and is not liable for an honest error of judgment." *Dickens v. Everhart,* 284 N.C. 95, 199 S.E. 2d 440.

"In order to warrant a jury in finding liability on the part of the surgeon, negligence must be established by the evidence. In order to escape nonsuit, evidence sufficient to permit a legitimate inference of facts constituting negligence must be offered. *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356. Ordinarily, the Court must determine as a matter of law whether the evidence in its light most favorable to the plaintiff is sufficient to permit legitimate inference of the facts necessary to be proved in order to establish actionable negligence. *Construction Co. v. Board of Education,* 262 N.C. 295, 136 S.E. 2d 635. 'It is the duty of the court to allow the motion (nonsuit) in either of two events: First, when all the evidence fails to establish a right of action on the part of the plaintiff; second, when it affirmatively appears from the evidence as a matter of law that the plaintiff is not entitled to recover.' " *Lentz v. Thompson,* 269 N.C. 188, 152 S.E. 2d 107.

"Proof of what is in accord with approved surgical procedure and what constitutes the standard of care required of the surgeon in performing an operation, like the advisability itself, are matters not within the knowledge of lay witnesses but must be established by the testimony of qualified experts." *Hunt v. Bradshaw, supra.*

When tested by the foregoing rules, the evidence of actionable negligence on the part of either of the physicians or the hospital was insufficient to be submitted to the jury. This record leaves the impression that a competent and skillful orthopedic surgeon gave expert treatment to a patient, age thirteen, for an extremely serious injury. The lower end of the broken bone in her upper right arm was jammed into her shoulder. The ends of the broken bone overlapped by as much as one inch. Dr. Wentz concluded that on account of her tender age, a cutting operation to realign the broken ends so soon after the injury might so disturb and disrupt the tendons, nerves, and blood vessels that continued growth of the arm would be endangered leaving it shorter and smaller than the left. Hence, he decided to apply traction to the lower arm and by the pulling force of the weight, gradually extend the lower arm until the broken bone was properly joined and realigned. However, x-rays taken after the rig was removed, disclosed the misalignment necessitating the operation. In the meantime, however, the ligaments, tendons, blood vessels, etc. had approached their normal condition. The opera-

tion turned out to be successful, leaving the arm as good as new except for the scar.

Judge Peel was correct in entering judgment dismissing the action. The decision of the Court of Appeals was correct in affirming the judgment. That decision is now

Affirmed.

Chief Justice BOBBITT not sitting.