THELMA R. THOMPSON v. DR. CHARLES R. LOCKERT

No. 7619SC943

(Filed 7 September 1977)

1. **Physicians, Surgeons and Allied Professions § 15; Evidence § 50—malpractice—expert medical testimony—similar locality rule**

   In a malpractice action against an orthopedic surgeon, the proper standard of care was not dictated by the standard of care customary among orthopedic surgeons who are Diplomates of the American Board of Orthopedic Surgeons regardless of the community of practice, since the "same or similar community" rule applies to health providers in this State; therefore, the trial court properly excluded the opinion testimony of a Diplomate of the American Board of Surgeons who practices orthopedic surgery in Smithtown, N.Y., concerning the standard of care exercised by defendant, a Diplomate of the American Board of Orthopedic Surgeons who practices orthopedic surgery in Salisbury, N.C., where there was no evidence showing whether the community in which the witness practices is similar to the community in which defendant practices or whether the witness was familiar with the standard of professional care and competence customary for Diplomates of the American Board of Orthopedic Surgeons practicing in a community similar to the one in which defendant practices. G.S. 8-93.

2. **Physicians, Surgeons and Allied Professions § 15; Evidence § 49.2—expert medical testimony—hypothetical questions—assumption of matters not in evidence**

   The trial court in a medical malpractice case did not err in the exclusion of opinion testimony by plaintiff's expert medical witness where hypothetical questions asked the witness assumed the existence and use by the witness of hospital records, letters, a physician's report and x-rays which were not introduced into evidence.

3. **Physicians, Surgeons and Allied Professions § 16— malpractice action—inapplicability of res ipsa loquitur**

   The doctrine of *res ipsa loquitur* was inapplicable in an action to recover damages allegedly resulting from defendant orthopedic surgeon's negligence in performing a laminectomy diskectomy on plaintiff.

1

**4. Physicians, Surgeons and Allied Professions § 17— malpractice—departing from approved procedures**

  In this action against an orthopedic surgeon to recover for injuries sustained when plaintiff's left iliac artery and inferior vena cava were lacerated during a laminectomy diskectomy, plaintiff's evidence was sufficient to justify, though not to require, a jury finding that defendant did not exercise reasonable diligence in the application of his knowledge and skill in that he failed to follow the procedure of always placing the blunt end of a certain surgical instrument against the bony wall of the upper or lower vertebra before opening and closing it, and he allowed the instrument to extend three millimeters through the anterior opening of the disc space where he opened and closed the biting end and thereby lacerated the iliac artery and vena cava.

APPEAL by plaintiff from *Albright, Judge.* Judgment entered 6 July 1976 in Superior Court, ROWAN County. Heard in the Court of Appeals 8 June 1977.

This is a medical malpractice action seeking damages for medical and hospital expenses, pain and suffering, and permanent disability.

On 1 August 1973 defendant performed a laminectomy diskectomy on plaintiff at the L4-L5 level. This operation was performed in Rowan Memorial Hospital. During the operation plaintiff's left iliac artery and inferior vena cava were lacerated. Additional surgical assistance was obtained to perform emergency abdominal surgery and the lacerations of the left iliac artery and inferior vena cava were sutured. Later in the same day plaintiff was transferred to North Carolina Baptist Hospital in Winston-Salem. There she immediately underwent femoral catheterization and bilateral obstruction of the iliacs was found. Plaintiff was taken to the operating room where an aorta-iliac bypass bilaterally was grafted for obstruction of the right and left iliac artery. She was thereafter placed on physical therapy and discharged on 13 September 1973.

There is no evidence that plaintiff's catheterization and the graft of the aorta-iliac bypass bilaterally which were performed at Winston-Salem were in any way necessitated by reason of plaintiff's laminectomy diskectomy and emergency abdominal surgery at Salisbury.

At the close of plaintiff's evidence the trial judge directed a verdict for defendant. Plaintiff appealed.

*Rutledge & Pruett, by W. Eugene Rutledge; Williams, Willeford, Boger & Grady, by John Hugh Williams and Samuel F. Davis, for the plaintiff.*

*Golding, Crews, Meekins, Gordon & Gray, by John G. Golding, for the defendant.*

BROCK, Chief Judge.

This appeal presents two basic questions which we will discuss in the following order:

I. Did the trial court err in excluding the opinion testimony of Dr. Richard S. Goodman, a Diplomate of the American Board of Orthopedic Surgeons, who practices Orthopedic Surgery in Smithtown, New York, concerning the standard of care exercised by defendant, a Diplomate of the American Board of Orthopedic Surgeons, who practices Orthopedic Surgery in Salisbury, North Carolina?

II. Did the trial court err in granting defendant's motion for a directed verdict on the grounds that plaintiff's evidence did not disclose negligence by defendant in performing the laminectomy diskectomy on defendant?

I

The defendant, Dr. Lockert, received his B.A. degree in 1958 and his M.D. degree in 1962 from Vanderbilt University, Nashville, Tennessee. His professors in Vanderbilt University Medical School were from throughout the country and had been trained at different medical schools throughout the country. Defendant completed his internship at Toledo Hospital, Toledo, Ohio. The doctors training defendant at Toledo were from medical schools throughout the country. At Maxwell Air Force Base, Montgomery, Alabama, defendant studied under doctors who had been educated in various parts of the United States. Defendant studied and finished orthopedic residency at the University Hospital, Baltimore, Maryland, in 1968. He was trained there by doctors from medical schools from various parts of the country. Defendant has been certified by and is a Diplomate of the American Board of Orthopedic Surgeons. Defendant began his practice in North Carolina in 1968. In the operation on plaintiff Dr. Lockert employed the training he had received prior to the time he moved to North Carolina. The equipment used by defendant in the operation on plaintiff is manufactured on a national basis. Defendant receives and studies national medical journals, and he attends seminars all over the United States and the world.

Dr. Richard S. Goodman received his M.D. degree from Bellevue Medical School, New York, in 1960. He served his internship at Indiana University Medical Center. Thereafter Dr. Goodman had a year of general surgery at Jacobi Hospital in the Bronx, New York. After two years in the United States Air Force Medical Corps Dr. Goodman served a residency in orthopedics at New York University, Bellevue Medical Center from 1964 to 1967. Since 1967 he had been engaged in the practice of orthopedic surgery in Smithtown, New York. Dr. Goodman has been certified by and is a Diplomate of the American Board of Orthopedic Surgeons.

[1] Plaintiff's evidence does not show whether the community in which Dr. Goodman practices is or is not similar to the community in which defendant practices. Plaintiff's evidence does not show whether Dr. Goodman is or is not familiar with the standard of professional competence and care customary for Diplomates of the American Board of Orthopedic Surgeons practicing in a community similar to the one in which defendant practices.

Plaintiff argues nevertheless that the proper standard of care in this case should be dictated by the standard of care customary among orthopedic surgeons who are Diplomates of the American Board of Orthopedic Surgeons regardless of the nature of the community of practice. Plaintiff argues, that the competence and standard of care of such a highly trained and certified specialist has no relation to the type of community in which he practices. Plaintiff's argument upon this point is both appealing and persuasive. However, there are at least two strong deterrents to its application.

In *Wiggins v. Piver*, 276 N.C. 134, 171 S.E. 2d 393 (1970), the Supreme Court of North Carolina abandoned the strict "locality" rule in favor of the "similar community" rule. This was further discussed and affirmed in *Dickens v. Everhart*, 284 N.C. 95, 199 S.E. 2d 440 (1973). We do not agree with plaintiff that *Rucker v. Hospital*, 285 N.C. 519, 206 S.E. 2d 196 (1974) further liberalized the application of the standard of care for physicians and surgeons. That case (Rucker) was applicable only to the standard of care of "accredited hospitals" in the treatment of a wound, the treatment for which was shown to be standard in "accredited hospitals" throughout the United States. While it is arguable that the reasoning in *Rucker* can be applied to Diplomates of the American Board of Orthopedic Surgeons we are confronted with a legislatively prescribed standard of care for "health care providers" in this State. Session Laws — 1975, Chapter 977, added Article 13 to Chapter 8 of the General

Statutes entitled "Medical Malpractice Actions." Under § 8-93 of this new Article 13 of Chapter 8 it is provided:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience *situated in the same or similar communities* at the time of the alleged act giving rise to the cause of action. (Emphasis added.)

Admittedly this legislation became effective on 1 July 1976 and does not apply to litigation pending on that date (the present action was instituted on 16 September 1974). However it clearly shows that the standard of care applicable to health providers in North Carolina as developed by case law is now adopted by the legislature. The case law and the legislation reflect the general policy of both the judicial and legislative branches of the government in North Carolina with respect to the standard of care to be imposed upon defendant in this case, *i.e.*, the "same or similar community" rule.

[2] In addition to plaintiff's failure to show that her expert witness, Dr. Goodman, was acquainted with the professional competence and care customary in communities similar to Salisbury, North Carolina, among Diplomates of the American Board of Orthopedic Surgeons, objections were properly sustained because of deficiencies in plaintiff's hypothetical questions as propounded to her expert witness.

> Plaintiff's expert witness, Dr. Goodman, testified by deposition. With relation to his review of the plaintiff's condition and the operation on plaintiff Dr. Goodman testified:

> "I was requested to review certain records with regard to surgery performed by Dr. Charles R. Lockert on Mrs. Thelma R. Thompson on August 1, 1973. These were — hospital record, Rowan Memorial Hospital from 7/30/73 to 8/1/73; hospital record N.C. Baptist Hospital, an admission of 9/24/73; medical record Rowan Memorial Hospital, 7/30/73 to 8/12/73. The hospital record obviously has a conflict in their [sic] dates, but that's the best I can give you anyway.

"There is a report of Dr. Wise dated July 17 of '74 of four pages; a covering letter dated July 22, '75, a letter of 1, 2, 3 pages dated December 9, 1975; deposition of Dr. Lockert and three letters from Mr. Rutledge dated February 16, 1976, March 1, 1976, and—two letters from Mr. Rutledge. There is my letter to Mr. Rutledge dated March 4, 1976.

"In addition to that I have examined some x-rays which I have returned to you, Mr. Rutledge.

"I have never practiced medicine in North Carolina and I have never seen the plaintiff, Mrs. Thompson, as a patient personally."

Thereafter plaintiff propounded a hypothetical question to Dr. Goodman which, *inter alia*, assumed the following facts: "[T]hat the operation was as described in the records which have been made available to you, and which are to be attached to this deposition, and based on your study of those records. . . ."

The deposition of Dr. Lockert (defendant) and the Rowan Memorial Hospital records were introduced in evidence in their entirety. However, plaintiff introduced only the discharge report, a handwritten transfer note from defendant and a Roentgen Report from the North Carolina Baptist Hospital records. Plaintiff did not offer to introduce in evidence the full North Carolina Baptist Hospital records, the four page report of Dr. Wise, a cover letter, a three page letter, two letters from Mr. Rutledge (plaintiff's counsel) nor the x-rays which her expert witness examined. The hypothetical question assumed the existence and use of each of the foregoing records by plaintiff's expert in arriving at his opinion. "Since it is the jury's province to find the facts, the data upon which an expert witness bases his opinion must be presented to the jury in accordance with established rules of evidence." *Todd v. Watts*, 269 N.C. 417, 420, 152 S.E. 2d 448, 451, (1967); 1 Stanbury's North Carolina Evidence, Brandis Revision, § 136 (1973). To be competent, a hypothetical question may include only facts which are in evidence or those which a jury might logically infer therefrom. *Keith v. Gas Co.*, 266 N.C. 119, 146 S.E. 2d 7 (1966).

For either of the two reasons discussed above defendant's objections to plaintiff's hypothetical questions were properly sustained.

II

Plaintiff argues that even without the opinion testimony the evidence required submission of the case to the jury on one or more of three premises:

(1) Application of the doctrine of *res ipsa loquiter*.

(2) Going outside the operative field in causing the injury was evidence of negligence.

(3) Evidence that defendant failed to exercise reasonable care and diligence in the application of his knowledge and skill in other particulars.

[3] We think the first two premises are the same. Plaintiff's theory of the "operative field" is a field confined to an area in which no injury to an adjoining member of the body could occur. To apply such a theory would be to apply the doctrine of *res ipsa loquiter*. Without a discussion of the application of the doctrine of *res ipsa loquiter* in North Carolina we hold that the doctrine does not apply in this case. *See Starnes v. Taylor*, 272 N.C. 386, 158 S.E. 2d 339 (1968); *Boyd v. Kistler*, 270 N.C. 744, 155 S.E. 2d 208 (1967); *Lentz v. Thompson*, 269 N.C. 188, 152 S.E. 2d 107 (1967); *Watson v. Clutts*, 262 N.C. 153, 136 S.E. 2d 617 (1964); *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762 (1955). Plaintiff's reliance upon *Mitchell v. Saunders*, 219 N.C. 178, 13 S.E. 2d 242 (1941) in support of the application of the doctrine is not well placed.

[4] We come now to the question of whether plaintiff's evidence tends to show that defendant failed to exercise reasonable care and diligence in the application of his knowledge and skill to the plaintiff's case. There is no contention that the need for plaintiff's laminectomy diskectomy was not properly indicated. There is no contention that defendant did not possess the requisite knowledge and skill to perform the laminectomy diskectomy. However, a physician or surgeon cannot be absolved from liability by a showing that he possesses the required professional knowledge and skill. He must exercise reasonable diligence in the application of that knowledge and skill to the particular patient's case. *Ballance v. Wentz*, 286 N.C. 294, 210 S.E. 2d 390 (1974).

Plaintiff's evidence of the details of the examination and treatment of plaintiff; of the techniques employed in the performance of the laminectomy diskectomy on plaintiff; of the standard of professional competence and care customary for Diplomates of the American Board of Orthopedic Surgeons practicing in communities

similar to Salisbury, North Carolina; and of the manner in which plaintiff was injured comes from Dr. Lockert, the defendant, who was called by plaintiff as her witness. This evidence can best be recapitulated by following closely the testimony of Dr. Lockert as follows:

I first saw Mrs. Thompson in 1970, I can't give you the exact date, with a problem in a toe on her left foot, that seemed to be a hammer toe deformity.

On this visit, Mrs. Thompson also complained of pain in her back. When she came into the hospital for the first time, she had x-rays at Rowan Memorial Hospital, showing a narrowing of the L4 interspace.

I operated on the toe to straighten it so the callus would go away. Later, I had to amputate the toe. During this period, in 1970, Mrs. Thompson was complaining of pain in her back.

I re-examined Mrs. Thompson in June 1973 for pain in her back and down her right leg. She had tenderness in her back in the L4-L5 area posteriorally, a positive straight leg rising sign on the right, indicating she had pressure on the sciatic nerve, weakness in her right great toe extensor, weak pulses in both legs with complaints of pain in her legs when she walked. This is called claudication pain, that is poor circulation in the legs and so that walking two or three blocks causes the legs to start hurting. She also stated she had to wear socks, heavy socks in the wintertime because her feet were cold.

Surgery was indicated because for several years she had back pain. However, I advised her to again attempt conservative treatment, and if this didn't work, to have a myelogram to determine if there was a definite ruptured disc. If such a disc were indicated, she would need a laminectomy diskectomy. A month after this advice, I admitted her to the Rowan Hospital.

A myelogram indicated she had external pressure from a herniated disc at the L4-L5 level.

The spine is made up of individual bones called vertebra, the largest portion of which is called the body. Between each vertebra is a disc that is enclosed in a thick capsule that goes around the peripherium. The body is not a perfect circle, but a semi-circular structure. Inside the capsule is the liquified material, a tissue the consistency of crab meat. The outside is

ligamentous, thick material, like you would see if you cut a tough steak. The white material in the steak is a ligament.

The function of the disc in the body is basically a shock absorber. It keeps the vertebral bodies separated. The disc capsule is made up of a tough material called the annulus fibrosus. Inside is another material the consistency of crab meat called the nucleus pulposus. When a disc develops a defect and there is more than one kind of defect it can develop, the tough covering, annulus fibrosus, could open up and the interior material, nucleus pulposus, comes out.

I discussed this operation with Mrs. Thompson and she consented to the surgery. At about 11:00 a.m. on August 1, 1973, she was brought to the operating room.

To perform this operation, the patient is laid on the stomach, and the body is entered from the back. The back is the posterior and the front is the anterior.

The procedure followed that morning is as follows: When I began my work, Mrs. Thompson had been put to sleep and a tube had been put in her trachea so that her breathing could be controlled. She had an electrocardiogram attached to show her heart rate and had on a blood pressure cup. The anesthesiologist had given her a general anesthetic. She was turned onto her stomach on a chest roll that allows the abdomen and chest room to breathe. The skin was prepped with a sterile solution. The surgeons were Dr. Watts and me. The incision was made in the midline of the back, running from the head toward the feet, starting at the L3 posterior spinous process down to the S1 process. The first incision was made, with a skin knife, down to the fatty tissue, approximately 2 centimeters or a centimeter and a half. The next incision is through a layer of muscle down to the posterior spinous processes of the vertebra, the portion closest to the back. The next structure is the posterior longitudinal ligament, a ligament inside the spinal canal and attached to the back of each of the vertebra and the disc space. It is not a protective ligament, per se, but runs the length of the spine to hold the vertebral bodies together and covers the opening to the disc space.

The posterior spinous processes is bone, which is bypassed to get to the inner space between L4-L5. The muscle is retracted, the spinal cord is moved out of the way as it is necessary to go through the canal.

The next structure is the lamina, the back of the spine, from which a portion of the bone must be removed using a carrison rongeur.

After removing the piece of bone there, there is a ligament inside of the spinal canal, but between these two interspaces called the ligament flavum. A ligament is a tissue that connects the bones and joints, made out of a cartilage or fibrous material. The best description I can give is that the white structure in meat is a ligament. To get through the flavum, a sharp knife section is made and the flavum is removed from the involved interspace.

The spinal canal is now directly visible. This contains the tip of the spinal cord and the nerve root at this interspace. The spinal canal is approximately 17 to 20 millimeters or 1-1/2 to 2 centimeters in depth. The spinal cord is about 1 centimeter. The spinal cord and the nerve root are retracted toward the opposite side from the operation. The nerve root and the spinal cord are crucially important and must not be damaged.

Mrs. Thompson had a calcified ridge across the back of this interspace where the disc had bulged out into the interspace and calcified. It had bulged out into the posterior longitudinal ligament which is the next obstacle you encounter in reaching the disc space. In this posterior longitudinal ligament a sharp incision is made with a knife blade. Normally, the posterior longitudinal ligament would not be calcified. At this point, I took a curet and removed this calcified ridge that ran the width of the spinal canal at the interspace of L4-L5. The disc space can now be visualized.

The disc space contains the material described earlier that looks like crab meat. The walls of the disc space are made up of circular fibrous ligament, the annulus fibrosus. It covers the entire exterior, not the interior. It's around the peripherium, not inside. When the disc material is removed, it is inside this disc covering. After the calcified ridge had been removed, I removed the loose fragments of this nucleus pulposus, the crab meat. The distance between the posterior and the anterior end of the disc space is approximately 1-1/8 to 1-1/2 inches, around 3 to 3-1/2 centimeters. These measurements are based on the average person.

The first tissue on the anterior side of the spinal column is the anterior longitudinal ligament which runs down the front of the spine, and crosses into the posterior longitudinal ligament.

The aorta is the main artery coming from the heart going to the lower extremities which lays right onto the anterior longitudinal ligament and, when it gets to the body of L4, it bifurcates. The vena cava lies right beside it. The diameter of the left iliac artery is approximately 15 to 20 millimeters, you could easily insert the tip of a small finger into it. The vena cava is larger, estimated size maybe 3/4 of an inch. A healthy blood vessel has a consistency of a piece of rubber tubing, a thin piece of rubber. (At this point the witness identified several instruments called pituitary rongeurs, Plaintiff's Exhibits C, D, & E, which were received as evidence.)

The red mark on Plaintiff's Exhibit C was placed on the instrument by me so that I could have some idea of the depth. This is the mark that was actually on that instrument on the date that I operated on Mrs. Thompson.

A diskectomy is done through a hole not much larger than the instrument being used. These instruments have a handle much like the carrison rongeur operated with the hand. There is one moveable part, a spoon. The other part remains stationary. The moveable part bites down to pinch or bite the tissues between the two parts. It is pulled out when it is closed. That is the instrument used to take the crab like material out. The objective in this operation is to get as much of the crab like material out of the capsule as possible.

There is no exact order of sequence in which these different rongeurs are used. I use them in no exact order that I know of. You have to use one to remove as much material as you can, then you use the second one and then you use the third, but you don't particularly use one before the other.

After reaching the point where I used the pituitary rongeurs, I used two rongeurs to remove as much material as I could. In removing the last instrument, I noticed bleeding in the space. I think I used the straight first but I don't know which I used second, third and so on. Bleeding in the disc space indicated to me that a major vessel had been injured. The bleeding was brisk. I did not know I had gone through the capsule. There is no major blood vessel located inside the disc capsule. I do not whether I had to cut a blood vessel, I could

have pulled some scar tissue off of it and possibly injured the vessel that way. You asked me if I know whether I'd cut it or not. I didn't know that I'd gone through the capsule.

After I noticed the bleeding in the disc space, I packed off the wound, put a sterile dressing over it and asked for Dr. McKenzie and Dr. Black to come into the room. I turned the patient to her back and prepped her abdomen. I then had the laparotomy set up. Dr. McKenzie and Dr. Black performed the laparotomy and I only assisted in the operation. Mrs. Thompson had prior abdominal surgery, which left a great deal of scar tissue. We found that there was an injury to the left common iliac artery, there was a hole in it approximately the size of a 3/4 millimeter, maybe the size of a large match head and there was an incomplete hole on either side of the vena cava. There was an opening on either side where it had been pinched by the instrument. There were two holes in the vena cava and one in the artery. They were sutured up. We gave Mrs. Thompson a number of units of blood and other liquids which totaled about 46 hundred cc's of foreign liquids, that were introduced into her body.

I then accompanied Mrs. Thompson, by ambulance, to the North Carolina Baptist Hospital and wrote a transfer note, admitting her under the care of another doctor.

I was removing material with the pituitary rongeurs from inside the capsule holding the disc material, the annulus fibrosus which completely encases the nucleus pulposus, in a normal structure. The anterior longitudinal ligament intermingles with the capsule and it is between the inferior vena cava and the artery. In Mrs. Thompson's case, the disc had ruptured in the posterior portion of the capsule, although this would not necessarily indicate that this was the weakest point. It had come through the annulus fibrosus. I did not inspect for any material on the anterior side of the anterior longitudinal ligament. I did not see the anterior longitudinal ligament at the time of surgery.

I indicated that I put marks on the instruments so that I would have some idea of the depth it was in the space. The instrument, as it comes from the manufacturer, is not calibrated. I use it as a precautionary method for my own use.

Mrs. Thompson's x-rays prior to the time of the operation showed bony spurring on the inferior lip of the L5 vertebra.

This could have something to do with the width of the disc space, at the point where the spurring occurs. I stated in the deposition that I thought the disc space in Mrs. Thompson's x-rays was average.

The measurement from the end of this particular pituitary rongeur to the red line drawn on the instrument is just a little bit less than 1-1/8 inch. During the operation I did not disregard the red marks and stick them into the disc space further than the mark is indicated. The red mark did not go into the interspace between the annulus fibrosus at any time. The vessels are right up against and coherent with the anterior longitudinal ligament, and the anterior longitudinal ligament is approximately one millimeter in thickness. The two or three millimeters referred to in the deposition includes the width of the annulus fibrosus and the anterior longitudinal ligament. In the deposition, I testified that the most anterior disc space was about three millimeters from the vessel. The disc space is the space that includes the nucleus pulposus. You don't remove the annulus fibrosus when you do a diskectomy, and so the thickness of this is approximately 2 millimeters, the thickness of the anterior longitudinal ligament is about one.

If the instrument went through the structures and there was a defect there, they could have gone through very easily. They didn't have to go through and cause the damage. If there was scar tissue, the scar tissue could have been ripped from the vessels, without violating the disc space. The pituitary rongeurs probably snipped these two blood vessels.

I never visualized or saw the anterior longitudinal ligament. I did testify that the posterior longitudinal ligament was calcified, there wasn't any defect or hole there. I did not visualize the anterior portion of the annulus fibrosus. I did know that it was ruptured on the posterior, I cannot testify to the anterior.

The term "operative field" means the field that you are working in. There is no such thing as defining the perimeter of any operative field, it isn't defined by borders or boundaries. It is just a general term and has no descriptive value. The number of obstacles between where you are supposed to be working and other areas has nothing to do with the determination of the operative field.

In removing disc material, I put the pituitary rongeurs in with the blunt end closed, feel of the structure, open them up and then clamp down on the tissue, then pull it out. Usually, I open them only once. I then take the instrument out of the wound, clean it off with a sponge and then go back in for another bite. While operating on Mrs. Thompson, I did not open and close the pituitary rongeurs twice without retracting them.

You can tell the difference between the blood vessels and the nucleus pulposus with your fingers. You can't tell it when you touch it with metal. You can only feel the difference between a hard, solid substance and a soft substance. In the deposition, I did testify that the operation was done entirely by feel. I described the vessel as being rubbery because you could pinch it together like a rubber tubing. You cannot distinguish the difference between the resilient blood vessel and the soft crab meat like material that constitutes the nucleus pulposus with an instrument. The entire operation is not done by feel. The portion of the operation inside the disc space is done by feel.

In the longitudinal ligament, I have an opening maybe 4 or 5 millimeters wide. I go down into the space and feel tissue. You have to put some pressure but you don't put very much pressure. You open the pituitary rongeurs against the tissue and pull back and remove the tissue, all in the same motion.

In Mrs. Thompson's operation, I slid the blunt nose of this instrument down the edge of the bone, and I felt the bone when I opened and closed the rongeur. The inferior vena cava and left iliac artery are one millimeter beyond the edge of the bone. The patient had a lot of scar tissue, a lot of spur formation in this area and it's a possibility that I felt the bone spur itself.

These rongeurs are bent for a purpose. That purpose is to make it more accessible to get to a certain area inside the disc space. The disc space is formed by the walls of the vertebra above and below. The other parts of the wall are formed by the annulus fibrosus. I felt the rongeur touch the bony wall of the disc space, not the fibrosus wall of the disc space, but it's a possibility you didn't have to, you could pull it off the scar tissue. If the blood vessels were actually bitten by the rongeurs, they would have been required to extend beyond the wall of the disc space. I wouldn't have had to push them through due to the fact that there was a diseased area here and there wasn't any wall there.

The hole in the iliac artery was a ragged hole, not a sharp or distinct cut. I did not scrape along the annulus fibrosus, I scraped along the bone.

There is no way to calculate the approximate amount of the disc material that is inside, it depends on the state of the tissue. The only thing I wanted to accomplish, outside of the annulus fibrosus of this disc space, was to take care of the calcified posterior longitudinal ligament outside of the disc space.

The posterior longitudinal ligament did not appear to have any defect other than it had calcified where the disc had ruptured. The material had probably been ruptured for a while and had degenerated and become hardened. I know that it had ruptured posteriorly, and was probably ruptured anteriorly also.

The first evidence of blood that I saw was after I had removed the rongeur, not at the time I had closed it. I do not know what was caught in the spoons of the rongeur at that point. The bleeding occurred immediately upon the retraction of the rongeur from the disc space. I knew this was to be the last rongeuring because we had used all three instruments and I was going back with the straight instrument which I do to make sure that no material had been pushed into the center of the disc space after using the curved instrument.

When the bleeding occurred, I was scraping the inside of the disc wall, the bottom of the disc capsule. I felt the bony wall when I put the blunt instrument against it, slid it down the bony wall, but did not feel it go past the end of the bony wall. As long as I feel the bone, I feel safe in opening and closing the pituitary rongeurs, as this is the only reference I have.

The inferior vena cava and the iliac artery are located anterior to the anterior longitudinal ligament.

From x-rays we knew that there was calcification in the main artery coming from the heart going towards the legs, called the aorta. It is demonstrated on the x-rays. We also knew that there was some calcification extending further down into the iliac artery here and here. The aorta separates into the iliac artery at a level approximately anterior to the body of the fourth lumbar vertebra.

The people participating in the operation until the time of the emergency were Dr. Watts, an anesthetist, a scrub nurse, a circulating nurse and I.

Dr. Watts is also a board certified orthopedic surgeon.

It is not customary in the Salisbury area for one of the members of an operating team performing a laminectomy diskectomy to be a neurosurgeon. There is not a neurosurgeon in Salisbury, North Carolina. Neither, is there a generalized custom in North Carolina for a neurosurgeon to be one of the members of an operating team doing a laminectomy disc removal operation.

Now, you can either use the curved or the straight rongeur, but as you go down, you always feel bone whether you go over on the lateral side or the medial side or anterior, you always feel bone and then open up your rongeur. You can feel resistance from the annulus fibrosus if there is resistance there to feel. You put the blunt end of the instrument to go into the disc space with your clamp, and once you feel it on bone, then you can open it up, bite the tissue and then remove the tissue out of the wound.

The surfaces of these two vertebral bones between which the operation is conducted is coated with a cartilaginous end plate. The vertebra itself is hard bone and the end plate, the inside of the covering on the bottom side of this bone and the bottom side of this bone is a cartilaginous thinner, softer material that's not calcified but it's a little bit harder than, say, muscle tissue. And it's the type of tissue that you'd probably see in an animal if the joint had been open, you'd see the smooth, kind of cartilaginous material on the end of the joint. Once we have started the operation and isolated the nerve root and the spinal cord, I never take my eyes off of this area that I'm working in. My assistant, and in this case, Dr. Watts, has the nerve root and spinal cord pulled away from me so that I can see this hole. When I go in with my rongeur to get a piece of tissue, to clean out the disc space, when I take this out I hand it over to my scrub nurse or Dr. Watts, my assistant, open it up and let them clean it out with a sponge. I never take my eyes off of this area because I do not want to lose my vision of the spinal cord and the nerve root.

We do not want to cause any injury at that point. So I never look at this instrument once it's outside of the body. They'll automatically clean my instrument and take the material away from me that I hand them, and then I can go back in for another piece.

In the operation you do take some of the cartilaginous plate, but you do not attempt to take the whole thing. It is soft, but you use it purposely for the touch of the instrument to know that you're in the disc space.

In doing this disc surgery, you always use the technique, with either the curved or the straight rongeur, you slide it down to the bone, whether you're over on the lateral side or the medial side or — when I say over on either side of the disc space — you feel a bone and you can also feel some resistance of the annulus fibrosus, but you don't try to push through that annulus fibrosus to see what's there, you use the bone primarily at all times whether you're up, which would be posterior her body or anterior to me, or whether you're anterior in her body or which would be posterior away from me. You use the bone as your feel. If there is an annulus fibrosus, you can feel the resistance to it. Obviously, if it wasn't there, you wouldn't feel it. We do use this mark, on this instrument, you can see came from and is made as it is that we've demonstrated here, is not calibrated in any way, and because of the fact that there's not much difference in the width of this stem of this instrument we use, when it's in the wound, if you didn't have some type mark, you could not really tell when you got past this point, so for that reason, we do put a mark on it to give us an indication of the depth of the instrument as it is in the disc space, because, as I've said we do not see inside the disc space because the end of this instrument is completely blocking our view of this disc space.

As you look at the body of the vertebra, you notice that they are not a perfect circle whatsoever. At this point here, the furtherest away at this point here, the vertebra starts curving back, not in a real circle, not a complete circle. I guess it's more like the shape of an egg if you look at it from that aspect. If you look at it from that aspect you see that it tapers off to either side. On this aspect of it, it's fairly well straight across in the canal. It's rounded in front and on the sides. The annulus fibrosus that goes around the crab meat like part of the disc does not project in any manner out forward of the lower surface of the vertebra on top of it or the upper surface of the vertebra that's below it. The annulus fibrosus is part of the disc that's the outer program of the disc, but it's at the edge of the bone. It doesn't protrude out away from the bone. It attaches to this bone here and runs all the way around in a strip and acts just

like a shell. You could not see the nucleus or the crab like material inside.

As to how using the bone as a guide as I've described gives assistance in attempting to avoid getting out past the area where the annulus fibrosus would be—well, in doing this procedure and in your training, you're trained to use the blunt end of the instrument. You never go in with the instrument opened up. You always go in with it closed and you use the bone as a guide. When you feel bone, you feel that you should be safe inside the disc space. I did employ that technique in doing the operation on Mrs. Thompson.

As to what visibility during the operation I had of the forward portion of the annulus fibrosus—you cannot see the forward portion. You're talking about the body, you cannot see this disc space. The only portion of the disk space that you can see is the incision you made in the posterior part here. Everything anterior to that you do not visualize. The hole is only about 4 millimeters, enough to introduce this instrument, and once this instrument is in there, you can't see into the hole. It actually plugs it. In a laminectomy diskectomy you never see the anterior longitudinal ligament because the anterior longitudinal ligament runs up the front of the spine and is enclosed inside of the body cavity the abdominal cavity. It is not part of the disc.

As to what complications there are that can occur during a disc operation such as that which Mrs. Thompson had—well, the primary problems in a disc surgery that the surgeon worries about is going. . .is in three categories. You worry about damage to the neural tissue, meaning that you worry about damage to the nerve root or you worry about damage to the spinal cord. You worry about vascular injuries, and you worry about infections. Primarily, during the surgery, you're worrying about the two. . .the vascular injuries and the injury to your neural tissue because you do everything possible that you can to make everything sterile and scrubbed so that you don't worry about the infection, just so that you keep the instruments sterile and do not contaminate your field. Everytime we're doing this operation, we worry about it in any particular case, whether it be Mrs. Thompson or what. We worry about the injury to the nerve root or to the spinal cord, or we worry about any injury to any vessel.

At the time the complication occurred in her case I was taking the precaution of protecting the neural or nervous tissue. We had isolated it, identified it and had it retracted and had Dr. Watts holding it toward the midline, and I was watching to make sure it stayed in that position. In trying to prevent vascular injury, the protection we used was just carrying out our usual and customary technique of doing the rongeuring inside the disc space. The aspects of the technique that were designed to attempt to avoid these injuries were to use the blunt nose of the pituitary rongeur, to make sure you're touching bone before you open and close your rongeurs, and we had put the precautionary mark on the instrument so that we made sure we were not more than one and one-eighth inches in the wound. One and one-eighth inches, meaning from the back part of the vertebral body. That's the measurement we used.

Just before I noticed the bleeding I have described, I did not feel any type of resistance that indicated to me that I was in contact with the annulus fibrosus. I used the instrument to slide down the bone, but I had not felt any resistance to the annulus fibrosus. I felt like I was still in the disc space because I could feel bone. The mark that I had put on the instrument as a precaution indicated that we could still see it. It was well outside out of the posterior part of the body, and I could definitely see the mark on the instrument.

It is my opinion, since I felt no resistance in doing this procedure, that the annulus fibrosus was diseased anterioraly and therefore the point of the rongeur was allowed to go through without any resistance. My opinion, as to the condition of the anterior longitudinal ligament in the vicinity where the injury to these vessels took place, is that the anterior longitudinal ligament, along with the annulus fibrosus, was weakening with disease, or actually non-resistant at that point. I feel this because I did not feel any resistance there, and I knew previously on x-rays that there was some spurring and disease in the anterior aspect of the vertebral bodies.

It is my opinion that I did not have to penetrate the disc space, there was enough disease and scar tissue, that when I pulled the last bit out, the scar tissue tore the vessels instead of cutting the vessels. The reason I think this could have been a possibility is that they were ragged edges and not sharp edges on the vessels.

In determining the manner in which I proceeded in this operation, I used the best judgment that I knew how to do in this surgery as I do in all surgery that I do. I used the best skill and technique. My hand did not at any point in the operation slip in any respect. I did not at any point up until the time I saw the blood have any indication that injury was being done or about to be done to these vessels.

I do not know definitely what happened to the vessels, but they probably were cut with the pituitary rongeur.

I feel like there must have been some disease in the anterior portion of the annulus fibrosus in the anterior longitudinal ligament in order to allow the instrument to penetrate without any resistance felt, however, it would be necessary for the spoon of the pituitary rongeur to pass out of the bony portion of the disc space in order to pass through a hole in the anterior longitudinal ligament. When it did it'd be right against the vessels at that time.

From the above testimony it can be seen that the standard of professional competence and care customary for Diplomates of the American Board of Orthopedic Surgeons practicing in communities similar to Salisbury, North Carolina, requires: in removing the nucleus pulposus from the disc space pituitary rongeurs are used; the pituitary rongeur is introduced into the disc space with the spoon-like blunt end closed; the blunt end is used to feel the bone of the upper or lower vertebra to make sure the instrument is used to scrape along the bone, not the annulus fibrosus; the instrument is not opened and closed unless it is first determined that it is safely inside the disc space by touching the bony wall of the upper or lower vertebra; the instrument is never inserted more than 1-1/8 inches into the disc space; the instrument is never inserted beyond the red mark on the handle.

The purpose of the above described technique which should be employed in the removal of the nucleus pulposus from the disc space is to avoid vascular injury.

Dr. Lockert testified that the blunt end of the rongeur was against the bony wall of the vertebra each time he opened and closed it; that he never inserted the instrument into the disc space beyond the red mark on the handle; and that the inferior vena cava and the left iliac artery may have been lacerated by the pulling of scar tissue which extended from them into the inside of the disc

space and which he clamped with the rongeur inside the disc space; and that his hand did not slip at any time during the procedure.

However, when all of the evidence is viewed in the light most favorable to the plaintiff, it tends to show the following: Dr. Lockert, from viewing x-rays, was aware that there was some spurring and disease in the anterior aspect of the vertebral bodies. Dr. Lockert knew that the most anterior disc space was only about three millimeters from the left iliac artery and the inferior vena cava. He knew that the disc had ruptured posteriorly and that it was probably ruptured anteriorly also. Dr. Lockert knew that he should always work along the bony wall of the upper and lower vertebra with the blunt end of the rongeur before opening and closing it to remove the nucleus pulposus from the disc space. He knew that the anterior annulus fibrosus was diseased and would offer no resistance to the rongeur. He knew that a defect in the anterior annulus fibrosus would allow the instrument very easily to pass through the anterior limit of the disc space. Dr. Lockert knew that the removal of the nucleus pulposus from within the disc space was done entirely by feel. He knew that one cannot feel with the instrument the difference between the nucleus pulposus and the blood vessels.

Further testimony from Dr. Lockert tended to show: The injury to the left common iliac artery was one hole about the size of a large match head. There were openings on either side of the vena cava where it had been pinched by the instrument. The pituitary rongeurs probably snipped these two blood vessels. If the blood vessels were bitten by the rongeurs, the rongeurs would have been required to extend beyond the wall of the disc space. Dr. Lockert did not feel any type of resistance that indicated to him that he was in contact with the annulus fibrosus. It was Dr. Lockert's opinion that the annulus fibrosus was diseased anteriorly and therefore the point of the rongeur was allowed to go through without any resistance. Dr. Lockert testified: "I do not know definitely what happened to the vessels, but they probably were cut with the pituitary rongeur."

[4] The evidence in this case would justify, though not require, the jury in finding that Dr. Lockert did not exercise reasonable diligence in the application of his knowledge and skill in the following respects: he failed to follow the procedure of always placing the blunt end of the rongeur against the bony wall of the upper or lower vertebra before opening and closing it; that he allowed the rongeur to extend beyond the 1-1/8 inch mark on the handle; that he allowed the instrument to extend three millimeters through the anterior

---

opening of the disc space where he opened and closed the biting end thereby lacerating the iliac artery and vena cava.

It is true that there is a conflict in plaintiff's evidence, and that there is evidence which would justify, though not require, the jury in finding that Dr. Lockert exercised reasonable diligence in every respect. However, the resolution of conflicting evidence is for the jury and not the court. In our opinion plaintiff was entitled to have the jury pass upon her evidence. The directed verdict for the defendant was erroneously entered.

New trial.

Judges HEDRICK and MARTIN concur.