RONALD CROCKER AND PAULETTE CROCKER AS CO-ADMINISTRATORS OF THE ESTATE
OF REAGAN ELIZABETH CROCKER v. H. PETER ROETHLING, M.D. AND WAYNE
WOMEN'S CLINIC, P.A.

No. 374PA07

(Filed 1 May 2009)

**Medical Malpractice— expert testimony—familiarity with community standard of care**

The separate opinions of Justice Hudson and Justice Martin, when taken together, constitute a majority of the Court in favor of reversing and remanding a decision of the Court of Appeals that affirmed the trial court's entry of summary judgment in favor of defendants in a medical malpractice wrongful death action on the ground that plaintiffs' only expert witness was incompetent to testify because he failed to demonstrate in his deposition and affidavit that he was sufficiently familiar with the relevant "same or similar community" standard of care. N.C.G.S. § 90-21.12.

Justice MARTIN concurring with separate mandate.

Justice EDMUNDS concurrs with concurring opinion.

Justice NEWBY dissenting.

Chief Justice PARKER and Justice BRADY join in dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, 184 N.C. App. 377, 646 S.E.2d 442 (2007), affirming an order granting summary judgment for defendants entered on 1 March 2006 by Judge W. Russell Duke, Jr., in Superior Court, Johnston County. Heard in the Supreme Court 18 March 2008.

*The McLeod Law Firm, P.A., by Joe McLeod; and Law Offices of Wade E. Byrd, P.A., by Wade E. Byrd, for plaintiff-appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Samuel G. Thompson and William H. Moss, for defendant-appellees.*

*Patterson Harkavy LLP, by Burton Craige, for North Carolina Academy of Trial Lawyers, amicus curiae.*

## CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

HUDSON, Justice.

In this medical malpractice case, we consider whether the trial court properly excluded plaintiffs' expert and granted summary judgment for defendants when the expert's opinions of his familiarity with the community at issue and of defendants' breach of the standard of care satisfy the requirements of N.C.G.S. § 90-21.12. We conclude that here, the expert's deposition and affidavit demonstrate "sufficient familiarity" with the "same or similar" community and that the trial court erred by excluding his testimony. Because the expert's evidence also provides opinions that create a genuine issue as to the material fact of defendants' breach of the standard of care, summary judgment should not have been granted.

Plaintiffs allege that their daughter, Reagan Elizabeth Crocker, was born to them in September 2001 in Goldsboro and died on 28 September 2003 due to severe, permanent birth-related injuries. Defendant H. Peter Roethling, M.D., an obstetrician with defendant Wayne Women's Clinic, delivered Reagan on 14 September 2001. During delivery, Reagan's shoulder became lodged against her mother's pelvis, preventing natural passage through the birth canal. This condition, called shoulder dystocia, delayed Reagan's birth and allegedly caused serious injuries. Plaintiffs contend that Dr. Roethling was negligent in failing to perform various maneuvers, including the Zavanelli maneuver, to dislodge Reagan's shoulder and hasten her delivery.

On 9 September 2004, plaintiffs, acting as co-administrators of Reagan's estate, filed a medical malpractice action in the superior court in Johnston County against Dr. Roethling, Wayne Women's Clinic, and other defendants later dismissed from the action. Plaintiffs sought damages for wrongful death, based on the alleged negligence of Dr. Roethling in delivering Reagan. On 1 March 2006, the trial court entered summary judgment for defendants after concluding that the testimony of plaintiffs' sole expert witness should be excluded. Plaintiffs appealed to the Court of Appeals, which filed a unanimous, unpublished opinion on 3 April 2007 affirming the trial court. The Court of Appeals granted a petition for rehearing on 6 June 2007 and reconsidered the case without additional briefs and without oral argument. The Court of Appeals filed a unanimous, unpublished superseding opinion on 3 July 2007, again affirming the trial court. That opinion stated that "the record before [the Court of Appeals] does not include sufficient facts tending to support [the expert's]" assertion in his 7 February 2006 affidavit "that he is 'familiar with the

prevailing standard of care for handling shoulder dystocia in the same or similar community to Goldsboro, North Carolina in 2001.' " *Crocker v. Roethling*, 184 N.C. App. 377, 646 S.E.2d 442, 2007 WL 1928681, at *3 (2007) (unpublished). On 8 November 2007, this Court allowed plaintiffs' petition for discretionary review. As discussed below, we conclude that summary judgment for defendants was not proper on this record. We reverse and remand.

The standard for granting summary judgment is well established. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2007). The trial court must consider the evidence in the light most favorable to the non-moving party. *E.g.*, *McCutchen v. McCutchen*, 360 N.C. 280, 286, 624 S.E.2d 620, 625 (2006) (citing *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004)).

"One of the essential elements of a claim for medical negligence is that the defendant breached the applicable standard of medical care owed to the plaintiff." *Goins v. Puleo*, 350 N.C. 277, 281, 512 S.E.2d 748, 751 (1999). To meet their burden of proving the applicable standard of care, plaintiffs must satisfy the requirements of N.C.G.S. § 90-21.12, which states in full:

In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence *that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities* at the time of the alleged act giving rise to the cause of action.

N.C.G.S. § 90-21.12 (2007) (emphasis added). Plaintiffs must establish the relevant standard of care through expert testimony. *Ballance v. Wentz*, 286 N.C. 294, 302, 210 S.E.2d 390, 395 (1974) (citation omitted); *Smith v. Whitmer*, 159 N.C. App. 192, 195, 582 S.E.2d 669, 671-72 (2003) (citations omitted). When plaintiffs have introduced evidence from an expert stating that the defendant doctor did not

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

meet the accepted medical standard, "[t]he evidence forecast by the plaintiffs establishes a genuine issue of material fact as to whether the defendant doctor breached the applicable standard of care and thereby proximately caused the plaintiffs' injuries." *Mozingo v. Pitt Cty. Mem'l Hosp., Inc.*, 331 N.C. 182, 191, 415 S.E.2d 341, 346 (1992) (citing *Turner v. Duke Univ.*, 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989)). This issue is ordinarily a question for the jury, and in such case, it is error for the trial court to enter summary judgment for the defendant. *Id.*; *see also Rouse v. Pitt Cty. Mem'l. Hosp., Inc.*, 343 N.C. 186, 197, 470 S.E.2d 44, 50 (1996).

Here, the trial court appears to have granted summary judgment to defendants on grounds that plaintiffs' only proposed medical expert, John P. Elliott, M.D., was insufficiently familiar with Goldsboro and was applying a national standard of care, thus requiring exclusion of his evidence. Having excluded the doctor from testifying, the court granted summary judgment for defendants. Ordinarily, we review the decision to exclude or admit expert testimony for an abuse of discretion. *DOT v. Haywood Cty.*, 360 N.C. 349, 351, 626 S.E.2d 645, 646 (2006); *see also* N.C.G.S. § 8C-1, Rule 104 (2007). "[T]his Court has uniformly held that the competency of a witness to testify as an expert is a question primarily addressed to the court, and his discretion is ordinarily conclusive, that is, unless there be no evidence to support the finding, or unless the judge abuse his discretion." *State v. Moore*, 245 N.C. 158, 164, 95 S.E.2d 548, 552 (1956). However, here, the pertinent inquiry is whether the trial court properly applied the statutory requirements of N.C.G.S. § 90-21.12 and the Rules of Evidence in considering Dr. Elliott's opinions at this stage of the proceedings. If we determine that the exclusion was erroneous, we then consider whether this testimony sufficiently forecast a genuine issue of material fact under *Mozingo*.

We note that the ruling at issue here occurred at the hearing solely calendared for the motion for summary judgment, not for a motion to exclude testimony. In fact, our review of the record reveals no motion to exclude, written or oral, nor was any motion to exclude listed on the calendar notice. Moreover, the reasons given in the transcript for the ruling (none appear in the order) include: that Dr. Elliott's information about Goldsboro showed that its hospital was different from the one in Phoenix where he practices; that all of the hospitals where Dr. Elliott has practiced are larger than the one in Goldsboro; and that "the Court finds that the [witness] was testifying . . . to a national standard of care and will exclude the evidence of

that expert." We conclude that this ruling and the order based there-upon result from a misapplication of Rule 702 and N.C.G.S. § 90-21.12.

The trial court must decide the preliminary question of the ad-missibility of expert testimony under the three-step approach adopted in *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995). The trial court thereunder must assess: 1) the reliability of the expert's methodology, 2) the qualifications of the proposed expert, and 3) the relevance of the expert's testimony. *Id.* at 527-29, 461 S.E.2d at 639-41). Applying *Goode* in the context of N.C.G.S. § 90-21.12, we note that North Carolina law has established a "workable" and "flexible" system for assessing" the admissibility of expert testimony under Rule 702. *Id.* at 469, 597 S.E.2d at 692. Here, the first two steps of the *Goode* analysis are not at issue; there is no controversial or novel "proffered scientific or technical method of proof" which defendants challenge as unreliable, nor have they questioned Dr. Elliott's qualifi-cations as a medical expert. 358 N.C. at 460-61, 597 S.E.2d at 687-88. Instead, defendants in essence dispute the relevance of Dr. Elliott's testimony, arguing that his testimony was not admissible because it did not address the relevant standard of care: that of Goldsboro or similar communities.

Dr. Elliott, plaintiffs' sole expert witness, practiced obstetrics in Phoenix, Arizona. In the hearing on the motion for summary judg-ment, counsel for defendants indicated he did not dispute Dr. Elliott's other qualifications, but that "the key issue" was whether he had " 'sufficient familiarity' with the standards of practice" in Goldsboro or similar communities. We note Dr. Elliott gave this testimony at a discovery deposition, conducted by the defense attorney, and not in response to direct examination by plaintiffs, who would later have the burden of tendering the qualifications of the expert. At such a dis-covery deposition, plaintiffs' attorney had no obligation to expand upon or clarify any of Dr. Elliott's qualifications or opinions; rather, the deposition was the defendants' opportunity to learn what they could about the other side's expert and his opinions. Even so, at his deposition on 30 August 2005, Dr. Elliott was able to accurately describe a number of features of the community at issue here, includ-ing the location and population of Goldsboro, and the number of obstetricians privileged at Wayne Memorial Hospital. He did testify that he believed a physician in either Phoenix or Goldsboro would have the "same" knowledge, but also correctly described the appli-cable standard of care as "that of a reasonably trained physician practicing in the same or similar circumstances."

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

On 10 February 2006, prior to the hearing on defendants' motion for summary judgment, plaintiffs filed Dr. Elliott's affidavit, which stated, in pertinent part:

3. I am familiar with the training, education and experience of Dr. Peter Roethling and have reviewed the transcript of Dr. Roethling's deposition wherein he discusses his training, education and experience and his practice in Goldsboro, North Carolina. . . .

4. I have reviewed information about the community of Goldsboro, North Carolina, Wayne County and Wayne Memorial Hospital for the period 2001 and am familiar with the size of the population, the level of care available at the hospital, the facilities and the number of health care providers for obstetrics. I am familiar with the prevailing standard of care for handling shoulder dystocia in the same or similar community to Goldsboro, North Carolina in 2001 by a physician with the same or similar training, education and experience as Dr. Roethling. The applicable standard in Goldsboro in 2001 for a board certified obstetrician such as Dr. Roethling who is also a clinical teacher required, among other things, that when progress is not made in delivery of a shoulder dystocia using standard maneuvers, the Zavenelli [sic] maneuver should be used.

The affidavit was discussed by plaintiffs' counsel at the argument on defendants' motion for summary judgment on 13 February 2006.

As noted above, the record does not reflect a written or oral motion to exclude the testimony of Dr. Elliott, but nevertheless defense counsel argued to the trial court, at the Court of Appeals, and again here that the doctor's testimony should be excluded because it was either based on a national standard or failed to "demonstrate that [Dr. Elliott] really [was] familiar with the standard of practice for similar communities," citing *Purvis v. Moses H. Cone Mem'l Hosp. Serv. Corp.*, 175 N.C. App. 474, 624 S.E.2d 380 (2006), *Smith v. Whitmer*, 159 N.C. App. 192, 582 S.E.2d 669, and *Henry v. Se. OB-GYN Assocs.*, 145 N.C. App. 208, 550 S.E.2d 245, *aff'd*, 354 N.C. 570, 557 S.E.2d 530 (2001). On the other hand, plaintiffs' counsel has argued at every level that Dr. Elliott's affidavit, particularly paragraphs three and four quoted above, should put the issue of familiarity with the same or similar community "to rest" if viewed according to the appropriate legal standard.

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

We agree with plaintiffs that the cases cited by defendants are distinguishable. In *Purvis*, the Court of Appeals held that an expert's testimony was properly excluded when his only stated knowledge of the community pertained to a period more than four years after the alleged injury occurred. 175 N.C. App. at 480-81, 624 S.E.2d at 385. Here, in contrast, Dr. Elliott specifically referred to the standard in effect at the time of the alleged negligence. In *Smith*, the expert "offered no testimony regarding defendants' training, experience, or the resources available in the defendants' medical community." 159 N.C. App. at 196, 582 S.E.2d at 672. The expert further testified that "the sole information he received or reviewed concerning the relevant standard of care in [the relevant community] was verbal information from plaintiff's attorney regarding 'the approximate size of the community and what goes on there' " and that he could not even recall what he had been told. *Id.* at 196-97, 582 S.E.2d at 672. He then stated that, in any event, there was a national standard of care. *Id. Henry* involved an expert who testified that he knew nothing about the community at issue, but gave an opinion that the standard of care for the particular procedure was the same across the nation. 145 N.C. App. at 210, 550 S.E.2d at 246-47. In none of these cases did the plaintiffs have a qualified expert like Dr. Elliott produce an affidavit clearly stating that he was familiar with the training and experience of the defendant physician and with the specific standard of care in the relevant community at the time of the alleged injury.

We conclude that, unlike the experts in *Purvis*, *Smith*, and *Henry*, Dr. Elliott demonstrated specific familiarity with and expressed unequivocal opinions regarding the standard of care in Goldsboro and similar communities, as well as in Dr. Roethling's own practice. While Dr. Elliott did state in his deposition that he expected "a physician in Phoenix [Arizona] to have the same knowledge as Dr. Roethling irrespective of their location," his subsequent affidavit expanded and clarified his familiarity with Dr. Roethling's obstetrical practice and with Goldsboro and Wayne County. The trial court may not automatically disqualify an expert witness simply because the witness indicates reliance on a national standard of care during a discovery deposition. Where, as here, the basis of the opinion and the expert's familiarity with the same or a similar community is undeveloped, the proponent must be given an opportunity to establish the witness's competency. However, the proponent does not have the duty to do so at the discovery deposition.

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

Dr. Elliott's sworn affidavit states that he had reviewed information about obstetrical care in Goldsboro and Wayne County and about Dr. Roethling's background and practice. Dr. Elliott also stated that he was familiar with the standard of care for handling shoulder dystocia in the community in 2001. Any questions as to whether Dr. Elliott had actually reviewed such information or whether he was truthful in stating that he was familiar with the relevant standard of care go to the credibility of the witness. Nothing in our statutes or case law suggests that a prospective medical expert must produce documentation of his research or attempt to explain to the trial judge how his knowledge about the community enabled him to ascertain the relevant standard of care. Nor do they prescribe any particular method by which a medical doctor must become "familiar" with a given community. Many methods are possible, and our jurisprudence indicates our desire to preserve flexibility in such proceedings. The witness must show only that "other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702(a).

Further, the dissent suggests that Dr. Elliott was required to explicate the basis for his opinion of the applicable standard of care before it could be admissible. Evidence Rule 705, "Disclosure of facts or data underlying expert opinion," provides in pertinent part:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion.

N.C.G.S. § 8C-1, Rule 705 (2007). Here, defense counsel did not request the underlying basis for the opinion at the deposition. It appears that defense counsel began to ask about the basis, but then withdrew the question. After Dr. Elliott gave his opinion on the standard of care, defense counsel stated the following: "Q: And what is it that allows you—well, strike that." As such, Dr. Elliott was not required, under our Rules, to state the basis for his opinion prior to the court's ruling on its admission.

As noted in the dissent, matters of credibility are for the jury, not for the trial court. *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940). We have cautioned trial courts against "asserting sweeping pre-trial 'gatekeeping' authority . . . [which] may unnec-

essarily encroach upon the constitutionally-mandated function of the jury to decide issues of fact and to assess the weight of the evidence." *Howerton*, 358 N.C. at 468, 597 S.E.2d at 692 (citing, *inter alia*, N.C. Const. art I, § 25 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469 (1993)).

Here, the trial court exceeded its limited function under Rule 104 by making a credibility determination about Dr. Elliott's testimony. Although the trial court's summary judgment order states that Dr. Elliott's affidavit was among the items reviewed, it appears from the transcript that the trial court did not properly consider the affidavit's content according to the requirements of N.C.G.S. § 90-21.12 and our Rules of Evidence, as interpreted by this Court. In the transcript of the summary judgment hearing, the judge refers only to Dr. Elliott's deposition and never acknowledges the affidavit's substantive content. Specifically, he referred to parts of Dr. Elliott's deposition that led him to conclude that Dr. Elliott would be "testifying in affect [sic] to a national standard of care." In the affidavit, Dr. Elliott states that he has reviewed information about Goldsboro and the level of hospital care there. Dr. Elliott's affidavit further states that he is "familiar with the prevailing standard of care for handling shoulder dystocia in the same or similar community to Goldsboro, North Carolina in 2001 by a physician with the same or similar training, education and experience as Dr. Roethling." Dr. Elliott's affidavit and deposition comply with the requirements of N.C.G.S. § 90-21.12 and demonstrate "sufficient familiarity" with the community at issue, rendering Dr. Elliott competent to testify on the relevant standard of care pursuant to Rule 702.

In his affidavit, Dr. Elliott stated: "Based on my review of the labor and delivery records . . . for Reagan Crocker, it is my opinion within a reasonable degree of medical certainty that Dr. Roethling breached the standard of care which caused Reagan to suffer hypoxic injury that ultimately led to her death." This statement, when considered in the light most favorable to plaintiffs, creates a genuine issue of material fact for the trier of fact under N.C.G.S. § 90-21.12 and Rule 56 regarding whether defendants breached the applicable standard of care, resulting in the injury to and death of Reagan Crocker. Summary judgment is not proper when a medical expert gives evidence tending to show that the defendant failed to meet the standard of care in the relevant community. *Mozingo*, 331 N.C. at 191, 415 S.E.2d at 346. Any question as to the credibility of Dr. Elliott's testimony on the standard of care is a matter for the jury. *See* N.C.G.S. § 90-21.12 ("[T]he defend-

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

ant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities . . . .") The trial court thus erred in granting summary judgment for defendants.

In sum, we hold that in a medical malpractice case: 1) gaps in the testimony of the plaintiff's expert during the defendant's discovery deposition may not properly form the basis of summary judgment for the defendant; 2) the trial court should consider affidavits submitted by the plaintiff or his witnesses in opposition to the defendant's motion for summary judgment in accordance with Rule 56; 3) to determine whether the plaintiff has presented evidence admissible to meet his burden under N.C.G.S. § 90-21.12 and Rule 702, the trial court should apply the test set forth in *State v. Goode*; 4) to determine whether an expert's testimony satisfies the third prong under *Goode* of familiarity with the "same or similar community" standard of care, the trial court should apply well-established principles of determining relevancy under Evidence Rules 401 and 701; and, 5) once the plaintiff raises a genuine issue as to whether the defendant's conduct breached the relevant standard of care, the resolution of that issue is for the trier of fact, usually the jury, per N.C.G.S. § 90-21.12. We reverse and remand to the Court of Appeals for further remand to the trial court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice MARTIN, concurring, with separate mandate.

In *Howerton v. Arai Helmet, Ltd.*, this Court examined and explained the standard for "ruling on the admissibility of expert testimony" in North Carolina. 358 N.C. 440, 455, 597 S.E.2d 674, 684 (2004). We acknowledged, on the one hand, that "trial courts must decide preliminary questions concerning the qualifications of experts to testify or the admissibility of expert testimony," and we reaffirmed that such decisions will generally be reviewed on appeal for abuse of discretion. *Id.* at 458, 597 S.E.2d at 686. We emphasized, on the other hand, that the trial court's preliminary assessment should not "go so far as to require the expert's testimony to be proven conclusively reliable or indisputably valid before it can be admitted into evidence." *Id.*

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

at 460, 597 S.E.2d at 687. Evidence may be " 'shaky but admissible,' " and it is the role of the jury to make any final determination regarding the weight to be afforded to the evidence. *Id.* at 460-61, 597 S.E.2d at 687-88 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)).

This Court took great care in *Howerton* to distinguish our approach to expert qualification and admissibility of expert testimony from the federal court procedures described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Howerton*, 358 N.C. at 469, 597 S.E.2d at 692-93. We stated that "application of the North Carolina approach is decidedly less mechanistic and rigorous than the 'exacting standards of reliability' demanded by the federal approach." *Id.* at 464, 597 S.E.2d at 690 (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000)). Our concern was that "trial courts asserting sweeping pre-trial 'gatekeeping' authority under *Daubert* may unnecessarily encroach upon the constitutionally-mandated function of the jury to decide issues of fact and to assess the weight of the evidence." *Id.* at 468, 597 S.E.2d at 692.

In the context of medical malpractice cases, our General Assembly has expressed a similar sentiment regarding the jury's function in weighing expert testimony. *See* N.C.G.S. § 90-21.12 (2007). Assuming expert testimony is properly qualified and placed before the trier of fact, section 90-21.12 reserves a role for the jury in determining whether an expert is sufficiently familiar with the prevailing standard of medical care in the community. *See id.* Under the statute, "the trier of the facts" must be "satisfied by the greater weight of the evidence that the care of [the] health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities." *Id.*

In the instant case, the record before this Court appears to present a close question as to whether plaintiffs' proffered expert, Dr. Elliott, was sufficiently familiar with the standard of care in Goldsboro. Dr. Elliott's deposition testimony tended not to support the admission of his testimony at trial. For instance, he did not know the designation of Wayne Memorial Hospital (in which plaintiffs' daughter was born) or the number of labor and delivery suites it had. He demonstrated little familiarity with Goldsboro or Wayne County beyond a basic estimate of population and general location within the state. He testified that most of his obstetrics career was spent in Phoenix, a metro area he believed had more than twenty times the

number of obstetricians than Goldsboro and a population exceeding that of Goldsboro by over four million people. Dr. Elliott himself had never performed the Zavanelli maneuver, nor had he ever observed it performed during his twenty-four years of practice in Phoenix. Moreover, at several points during his deposition, he appeared to be applying a national standard of care rather than the "same or similar community" standard required by our General Assembly in section 90-21.12. *See* § 90-21.12.

Dr. Elliott's affidavit, on the other hand, indicated that he had researched and was knowledgeable about the standard of care in Goldsboro. For example, Dr. Elliott stated that after reviewing various materials, he was familiar with "the training, education and experience of Dr. Peter Roethling," "the size of the population [of Goldsboro], the level of care available at the hospital, the facilities and the number of health care providers for obstetrics," and "the prevailing standard of care for handling shoulder dystocia in the same or similar community to Goldsboro."

Our statutes and case law do not require an expert to have actually practiced in the community in which the alleged malpractice occurred, or even to have practiced in a similar community. *See* § 90-21.12; *see also* N.C.G.S. § 8C-1, Rule 702(b) (2007) (indicating that an expert in a medical malpractice case need not be licensed in North Carolina so long as the expert is licensed in some other state). In this regard, I agree with Justice Hudson's opinion that our law does not "prescribe any particular method by which a medical doctor must become 'familiar' with a given community." Book or Internet research may be a perfectly acceptable method of educating oneself regarding the standard of medical care applicable in a particular community. *See, e.g., Coffman v. Roberson*, 153 N.C. App. 618, 624, 571 S.E.2d 255, 259 (2002) (holding medical expert demonstrated sufficient familiarity with applicable standard of care when that familiarity was gained in part from "Internet research about the size of the hospital, the training program, and the AHEC (Area Health Education Center) program"), *disc. rev. denied*, 356 N.C. 668, 577 S.E.2d 111 (2003).

Although the trial court appropriately considered both Dr. Elliott's deposition testimony and his affidavit in determining whether to admit his expert opinion at trial, these discovery materials did not adequately convey a complete picture of Dr. Elliott's qualifications or the reliability of his proposed testimony. Defend-

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

ants' deposition of plaintiffs' proposed expert suggested a lack of relevant knowledge about Goldsboro, while the expert's affidavit asserted his familiarity without explaining what materials he reviewed or the way in which those materials influenced his determination of the applicable standard of medical care. Moreover, the trial court based its decision to exclude Dr. Elliott primarily on a paper record, considering the video deposition transcript, the affidavit, and brief oral argument by counsel. Thus, the trial court was in no better position than this Court to review the record and to assess Dr. Elliott's qualifications and the reliability of his proposed testimony. *See In re Greene*, 306 N.C. 376, 380, 297 S.E.2d 379, 382 (1982) (explaining that "[t]his Court, unlike a trial court, is ill-equipped to resolve disputed questions of fact" because we "do not hear live testimony of sworn witnesses and are required to rely exclusively upon written records").

When the proffered expert's familiarity with the relevant standard of care is unclear from the paper record, our trial courts should consider requiring the production of the expert for purposes of voir dire examination. In such situations, particularly when the admissibility decision may be outcome-determinative, the expense of voir dire examination and its possible inconvenience to the parties and the expert are justified in order to ensure a fair and just adjudication. Voir dire examination provides the trial court with the opportunity to explore the foundation of the expert's familiarity with the community, the method by which the expert arrived at his conclusion regarding the applicable standard of care, and the link between this method and the expert's ultimate opinion. Moreover, unlike the non-adversarial discovery process, counsel for both parties may participate equally in a voir dire hearing and help elicit all information relevant to the expert's qualifications and the admissibility of the proposed testimony.

Perhaps most importantly, voir dire examination provides the trial court with an informed basis to guide the exercise of its discretion. It is precisely because the trial court " 'has the advantage of seeing and hearing the witnesses' " that the trial court's discretionary decision is entitled to deference on appeal. *State v. Lasiter*, 361 N.C. 299, 305, 643 S.E.2d 909, 912 (2007) (quoting *State v. Little*, 270 N.C. 234, 240, 154 S.E.2d 61, 66 (1967)) (explaining further that the trial court's firsthand observations of jury voir dire enable it to " 'gain a "feel" of the case which a cold record denies to a reviewing court' " (quoting *Little*, 270 N.C. at 240, 154 S.E.2d at 66)).

I do not suggest that voir dire examination is necessary in every case in which opposing counsel challenges a proffered expert's qualifications or proposed testimony. In light of the emphasis *Howerton* places on the jury's role in evaluating expert testimony, however, voir dire examination may be prudent in close cases. In *Howerton,* this Court expressed concern with "the case-dispositive nature of *Daubert* proceedings, whereby parties in civil actions may use pretrial motions to exclude expert testimony under *Daubert* to bootstrap motions for summary judgment that otherwise would not likely succeed." *Howerton,* 358 N.C. at 467, 597 S.E.2d at 691 (stating further: "[A] party may use a [pre-trial] hearing to exclude an opponent's expert testimony on an essential element of the cause of action. With no other means of proving that element of the claim, the non-moving party would inevitably perish in the ensuing motion for summary judgment." *Id.* at 468, 597 S.E.2d at 692.).

The same concern is implicated in the instant case, in which defendants sought and received summary judgment immediately after the trial court's exclusion of plaintiffs' tendered expert. At the end of counsels' arguments, following discussion about Dr. Elliott's deposition testimony and affidavit, plaintiffs' counsel noted to the trial court that "[t]his is not the cross-examination of Dr. Elliott at a voir dire [examination]." As counsel's remark implies, here, and in similar cases, the voir dire procedure provides a more reliable assessment mechanism than discovery depositions or conclusory affidavits, protecting the jury from unreliable expert testimony yet preserving the jury's role in weighing the credibility of expert testimony when appropriate.

For the foregoing reasons, this case is reversed and remanded to the Court of Appeals for further remand to the trial court with instructions to conduct a voir dire examination of plaintiffs' proffered expert and, based on this evidentiary foundation, to determine the admissibility of the proposed expert testimony. *See Marks v. United States,* 430 U.S. 188 (1977).

Justice EDMUNDS concurs in this opinion.

Justice NEWBY dissenting.

In my view, this case presents the issue of whether a tendered expert's unsubstantiated statements of familiarity with the applicable standard of care in a medical malpractice action mandate a voir dire examination to determine whether the expert is competent to testify

at trial.[1] While I agree that the trial court in its discretion could have conducted a voir dire of the proffered expert, under the facts of this case and the long-established deferential standard of review, I do not believe the trial court's decision not to do so was an abuse of discretion requiring this Court to intervene and direct the proceedings of the trial court. I therefore respectfully dissent.

Plaintiffs brought this action alleging that defendants committed medical malpractice during the delivery of plaintiffs' daughter Reagan at Wayne Memorial Hospital in Goldsboro. Plaintiffs sought to contend at trial that defendant H. Peter Roethling, M.D. breached the applicable standard of care while delivering Reagan by failing to perform what is known as the Zavanelli maneuver. The Zavanelli maneuver is a medical procedure by which a baby suffering shoulder dystocia is pushed back into the mother's uterus, relieving compression on the umbilical cord and enabling the baby to receive sufficient oxygen. Delivery is thus delayed until an emergency cesarean section can be performed.

Plaintiffs tendered John P. Elliott, M.D. as their only expert witness. He intended to testify that the Zavanelli maneuver was part of the standard of care applicable to a board-certified obstetrician in Goldsboro at the time of Reagan's birth and, therefore, that defendant Roethling breached the standard of care in failing to perform the maneuver. As will be detailed more fully below, Dr. Elliott had no experience practicing in Goldsboro or any similar community and, when he formed his opinion, had very little knowledge of defendant Roethling's training, of the Goldsboro community in general, or of the medical facilities at Wayne Memorial Hospital.

Defendants sought to exclude Dr. Elliott's testimony and, based upon the possible exclusion, moved for summary judgment on 1 Feb-

---

1. The separate opinions of Justice Martin and Justice Hudson, when taken together, constitute a majority of the Court in favor of reversing and remanding. Justice Martin's opinion, having the narrower directive, is the controlling opinion, *cf. Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 260, 266 (1977) ("When a fragmented [Supreme Court of the United States] decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 2923, 49 L. Ed. 2d 859, 872 (1976) (opinion of Stewart, Powell, and Stevens, JJ.))), and requires the trial court to conduct a voir dire examination of the proffered expert witness. References in this dissenting opinion to "the majority" denote matters as to which the opinions of Justices Martin and Hudson seem to agree. When responding to one of those opinions separately, this dissenting opinion will refer to the authoring Justice by name.

ruary 2006. After a hearing on the motion, the trial court found that Dr. Elliott had impermissibly based his opinion on a national standard of care, and on 1 March 2006, the court entered an order excluding Dr. Elliott's testimony and granting summary judgment in favor of defendants. Plaintiffs appealed, and the Court of Appeals affirmed the trial court. This Court allowed discretionary review to determine whether it was proper for the trial court to exclude Dr. Elliott's testimony and grant defendants' motion for summary judgment.

Section 90-21.12 of the General Statutes, entitled "Standard of health care," provides:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

N.C.G.S. § 90-21.12 (2007). Under this statute, the plaintiff in a medical malpractice suit bears the burden of proving the defendant failed to comply with the applicable standard of care. To do so, the plaintiff must first establish the content of that standard by providing evidence of "the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action." *Id.* Due to the specialized nature of the standard of care in medical malpractice cases, the content and meaning of the standard must be demonstrated by expert testimony. *See id.* § 1A-1, Rule 9(j) (2007); *id.* § 8C-1, Rule 702(a) (2007); *Ballance v. Wentz*, 286 N.C. 294, 302, 210 S.E.2d 390, 395 (1974).

Regardless of context, the decision whether to admit expert testimony lies within the province of the trial court. N.C.G.S. § 8C-1, Rule 104(a) (2007).

> "[A] trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

(2004). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

*N.C. Dep't of Transp. v. Haywood Cty.*, 360 N.C. 349, 351, 626 S.E.2d 645, 646 (2006) (alteration in original). The abuse of discretion standard is firmly entrenched in our caselaw for appellate review of trial courts' discretionary decisions, and the implication by a majority of this Court that abuse of discretion does not apply here thus represents a sharp departure from precedent. In stating that "the pertinent inquiry is whether the trial court properly applied the statutory requirements of N.C.G.S. § 90-21.12 and the Rules of Evidence," moreover, Justice Hudson's opinion fails to set forth any real standard of review to fill the void. Justice Martin likewise neglects to state the standard under which he deems a voir dire examination necessary. The statutory provisions to which Justice Hudson refers do indeed contain standards that the trial court must apply, but those standards simply define inquiries and determinations that are left *to the discretion of the trial court*. Abuse of discretion therefore remains the proper standard for our review of the trial court's decision to exclude Dr. Elliott's testimony.

Although the jury is entrusted with weighing the credibility of expert testimony that has been deemed admissible, the abuse of discretion standard affords the trial court wide latitude in performing the preliminary function of evaluating whether the expert in question is competent to testify. *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940) ("The competency, admissibility, and sufficiency of the evidence is a matter for the court to determine. The credibility, probative force, and weight is a matter for the jury. This principle is so well settled we do not think it necessary to cite authorities."). In this case, prior to stating his opinions before a jury, Dr. Elliott was required to demonstrate to the trial court his competency to testify regarding the applicable standard of care.

As the General Statutes reflect, the trial court's traditional duty to determine the admissibility of expert testimony is particularly important in the medical malpractice context. In medical malpractice suits in which the plaintiff does not rely on the doctrine of *res ipsa loquitur*, our Rules of Civil Procedure require the trial court to determine whether the plaintiff's pleading asserts that an expert witness will "testify that the medical care did not comply with the applicable

standard of care" and, if the pleading fails to do so, to dismiss the complaint. N.C.G.S. § 1A-1, Rule 9(j); *id.* § 90-21.12. Similarly, a witness can testify to the "scientific, technical or other specialized knowledge" that is crucial in medical malpractice cases only after the trial court is satisfied that the witness is "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* § 8C-1, Rule 702(a). This consistent interposition of the trial court between potential expert witnesses and the jury represents sound legislative policy, as lay jurors will naturally accord great weight to expert testimony. *Billips v. Commonwealth*, 274 Va. 805, 809, 652 S.E.2d 99, 101-02 (2007) ("Advancements in the sciences continually outpace the education of laymen, a category that includes judges, jurors and lawyers . . . . Consequently, there is a risk that those essential components of the judicial system may gravitate toward uncritical acceptance of any pronouncement that appears to be 'scientific,' . . . .").

In determining whether an expert's testimony is sufficiently reliable for admission, the trial court must make "a preliminary, foundational inquiry into the basic methodological adequacy of [the] expert testimony." *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687 (citing *Queen City Coach Co.*, 218 N.C. at 323, 11 S.E.2d at 343). Notwithstanding Justice Hudson's intimation to the contrary, an expert's methodology need not be especially "controversial or novel" for its reliability to come under scrutiny. Just as it must do in cases involving expert testimony derived from complex scientific methods, the trial court in a medical malpractice action must examine the process by which the expert arrived at the proffered opinion on the content of the applicable standard of care. The court must be able to determine which information the expert used in forming the opinion as well as how the expert used that information.

I agree with Justice Martin's view that when opposing counsel challenges an expert's competency to testify to the applicable standard of care, and it is a close case as to whether the expert is sufficiently familiar with that standard, the best practice is for the trial court to conduct a voir dire examination of the proffered expert witness. In fact, had the trial court elected to hold a voir dire hearing to determine Dr. Elliott's competency to testify, I would find no abuse of discretion in that decision. However, when the record alone demonstrates that the expert lacks the required familiarity, a voir dire hearing is not required as a matter of law. In the instant case, the record reveals that while Dr. Elliott asserted his familiarity with the applicable standard, he had minimal knowledge of Goldsboro or any similar

communities and was simply applying a national standard of care when he formed his opinion. Moreover, despite his years of practice in a large metropolitan area, Dr. Elliott had no personal experience with the procedure about which he sought to testify and knew of no specific instances of its use. In such cases the trial court may properly deem the proffered expert witness incompetent to testify without the expense and inconvenience of a voir dire examination. ·

In challenging Dr. Elliott's familiarity with the applicable standard of care, defendants questioned not only the relevance of his opinions but also the reliability of the methods he used to formulate those opinions. In so doing, defendants disputed the accuracy, not the truthfulness, of Dr. Elliott's conclusion that he was familiar with the standard applicable to Goldsboro or a similar community. In other words, defendants challenged Dr. Elliott's competency, not his credibility. As noted by Justice Hudson, both the relevance of an expert's testimony and the reliability of the expert's methodology are questions of law to be determined by the court in its admissibility inquiry. *Id.* at 458, 597 S.E.2d at 686 (citing *State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-41 (1995)). Questions of the relevance of Dr. Elliott's testimony and the reliability of his methods cannot simply be decided by Dr. Elliott. The court must look beyond his bare assertions and decide these issues for itself.

I do not dispute the majority's statement that there is no "particular method by which a medical doctor must become 'familiar' with a given community." I do believe, however, that in order for the trial court to properly decide Dr. Elliott was competent to testify to the standard of care applicable in Goldsboro or similar communities, Dr. Elliott was required to demonstrate to the court *some* acceptable method by which he arrived at his conclusion on the content of Goldsboro's standard of care. The evidence before the court failed to establish such a method. Dr. Elliott was a member of the same health care profession as defendant Roethling, both being board-certified obstetricians. He knew that defendant Roethling had completed a residency in obstetrics and gynecology, but he demonstrated no further knowledge of defendant Roethling's training and experience. Dr. Elliott knew the approximate population of the Goldsboro area and the number of obstetricians practicing there, but he had no personal experience practicing in Goldsboro or any similar community. He recited basic facts about defendant Roethling and about Goldsboro, but ultimately failed to clarify how those facts served to familiarize him with the applicable standard of care. As defense counsel stated

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

at the motion hearing, Dr. Elliott simply failed to "connect the dots between Goldsboro or a similar community" and the personal knowledge and experience that resulted in the formulation of his opinion.

This Court has affirmed two Court of Appeals opinions that upheld the trial court's function of determining admissibility by requiring expert witnesses to elucidate both the facts underlying their proffered testimony and the logical link between those facts and the experts' opinions. In *Henry v. Southeastern OB-GYN Associates*, 145 N.C. App. 208, 550 S.E.2d 245, *aff'd per curiam*, 354 N.C. 570, 557 S.E.2d 530 (2001), the Court of Appeals held an expert was properly excluded because his assertion of familiarity with a national standard of care failed to demonstrate sufficient knowledge of the standard of care in Wilmington or a similar community. *Id.* at 212-13, 550 S.E.2d at 248. The court noted the lack of a meaningful connection between the facts the expert used and his conclusion on the applicable standard of care, stating there was no evidence that a national standard applied to Wilmington or that the community in which the expert practiced was similar to Wilmington. *Id.* at 210, 550 S.E.2d at 246-47. The Court of Appeals also upheld the trial court's refusal to allow the expert to testify at trial that he was familiar with the standard of care applicable to Wilmington or similar communities, because such testimony would have contradicted the expert's deposition testimony. *Id.* at 217-20, 550 S.E.2d at 251-52 (Hudson, J., dissenting).

In *Pitts v. Nash Day Hospital, Inc.*, 167 N.C. App. 194, 605 S.E.2d 154 (2004), *aff'd per curiam*, 359 N.C. 626, 614 S.E.2d 267 (2005), the Court of Appeals performed a similar analysis in holding that an expert was improperly excluded. The court found that a number of strong similarities between the personal experience of the expert and that of the defendant medical doctor represented a reliable method for the expert to use in drawing conclusions regarding the applicable standard of care. Specifically, the court noted the expert and the defendant doctor had comparable "skill, training, and experience," both having practiced extensively in North Carolina; the expert had practiced in communities throughout North Carolina and testified to their similarity to the community in question "in terms of population served, rural nature, depressed economy, and limitations on resources"; and the expert "was familiar with the equipment [used by the defendant doctor] because he used similar . . . equipment in other communities in his medical practice." *Id.* at 198, 605 S.E.2d at 156-57. The numerous similarities in the two doctors' backgrounds gave the court sufficient grounds upon which to conclude the expert's method

of forming an opinion on the applicable standard of care was reliable. *Id.* at 199, 605 S.E.2d at 157.

These cases demonstrate that neither an expert's bald assertion of familiarity with the applicable standard of care nor mere superficial statements of fact about the community in question can give the trial court a sufficient basis to deem the expert's methods reliable or the resulting testimony relevant. When challenged, the expert must not only state with specificity the facts that contributed to the proffered opinion, but also make clear to the court how those facts enabled the expert to arrive at a conclusion. This latter step must be performed most explicitly when, as in the instant case, the expert has no personal experience in the community at issue or any similar community.

The record reflects that at the time of his testimony, Dr. Elliott was licensed to practice medicine in Arizona, California, and Colorado, but not in North Carolina. He gave his deposition testimony from Phoenix, Arizona via videoconference. His practice at the time was at Good Samaritan Regional Medical Center ("Good Samaritan") in Phoenix, and he had spent his career practicing in Phoenix and in various Army hospitals, none of which were located in North Carolina. According to Dr. Elliott, Good Samaritan services the Phoenix metropolitan area, the population of which he estimated at "about four and a half million," and also draws patients from across Arizona and throughout the country. In contrast, Dr. Elliott estimated the population of the Goldsboro area at "a little over 100,000 people." He further approximated that there were "in excess of 200" obstetricians practicing in the Phoenix metropolitan area, compared to a total of 8 obstetricians in the Goldsboro area. Dr. Elliott had never practiced in Goldsboro and admitted in his deposition that he had never even practiced in a community similar to Goldsboro.

Dr. Elliott's deposition is devoid of specific facts pertaining to defendant Roethling's training and experience, aside from the basic knowledge that defendant Roethling had completed a residency in obstetrics and gynecology. He also did not know how long defendant Roethling had been in practice. As discussed above, Dr. Elliott's deposition testimony does reveal some secondhand knowledge of the Goldsboro community. He had familiarized himself with the total population of the Goldsboro area and Wayne County's relative location in North Carolina. He also knew the number of obstetricians practicing in Goldsboro at the time of Reagan Crocker's birth.

Nonetheless, his knowledge of the facilities available at Wayne Memorial Hospital was vague at best: he "believe[d] they [did] not have a neonatal intensive care unit," and he did not know how many labor and delivery suites they had. At no point in his deposition or his affidavit did Dr. Elliott explain how the basic facts he knew about defendant Roethling and the Goldsboro community enabled him to conclude that the standard of care applicable to an obstetrician in Goldsboro or any similar community required use of the Zavanelli maneuver in Reagan Crocker's case.

Dr. Elliott failed to articulate a proper basis for his conclusions even though defense counsel fully explored his familiarity with the community at issue, other similar communities, and the applicable standard of care. Defense counsel repeatedly asked Dr. Elliott about specific facts regarding Goldsboro that may have contributed to his testimony, for instance by inquiring into his familiarity with the exact medical facilities available at Wayne Memorial Hospital. Counsel also asked about Dr. Elliott's experience in similar communities and found he had none. Perhaps most importantly, counsel specifically requested that Dr. Elliott explain how he arrived at his conclusion on the content of Goldsboro's standard of care, asking, "Why is it that you think that the Zavanelli maneuver is something that a physician like Dr. Roethling should have considered doing as opposed to perhaps something that you would expect one of your colleagues in Phoenix to do?" Dr. Elliott responded:

> Well, I expect Dr. Roethling reads the same literature that I would or my colleagues in Phoenix would. The textbooks are the same. They are not written for, you know, Goldsboro, North Carolina versus Cleveland, Ohio or Phoenix, Arizona. The information is really very general information. The articles that are published are very general information. And the expected behaviors are very similar. So I would expect a physician in Phoenix to have the same knowledge as Dr. Roethling irrespective of their location.

Like the tendered expert in *Henry v. Southeastern OB-GYN Associates*, Dr. Elliott essentially testified to a belief in a national standard of care for obstetricians, yet failed to demonstrate how his minimal knowledge of Goldsboro led to his conclusion that such a standard applies to Goldsboro or any similar community.

Furthermore, it is not even clear that Dr. Elliott used reliable methods in concluding the Zavanelli maneuver is part of the standard

of care applicable to Phoenix. Regarding his own experience in dealing with shoulder dystocia, Dr. Elliott testified that he had never himself performed or witnessed the Zavanelli maneuver and was unaware of any member of his own medical group, consisting of fifteen physicians who deliver babies, ever using the maneuver while practicing in Phoenix. Although Good Samaritan services a much larger population and has considerably more extensive facilities than Wayne Memorial Hospital, Dr. Elliott could not recall any specific case during his twenty-four years at Good Samaritan in which any obstetrician attempted the maneuver. The record also reflects that Dr. Elliott's opinion was based in part on a worldwide study that found only about one hundred reported cases in which the Zavanelli maneuver was used between 1985, when the maneuver was first mentioned in medical literature, and 1997, four years before Reagan's birth. If the reported usage of the Zavanelli maneuver is, on average, fewer than ten times per year throughout the world, it is unclear how Dr. Elliott could reliably conclude the maneuver is part of the standard of care in Phoenix, let alone Goldsboro.

The majority de-emphasizes the insufficiency of Dr. Elliott's deposition testimony by pointing to his affidavit. In so doing, I believe the majority places too much importance on the affidavit. Unlike a deposition, an affidavit gives the opposing party no opportunity to cross-examine the affiant. Thus, crediting the affidavit over the deposition fails to give due respect to the adversarial means by which our justice system seeks to ascertain truth. *See In re Miller*, 357 N.C. 316, 334, 584 S.E.2d 772, 785-86 (2003) (citations omitted). In my view, in deciding questions of reliability and relevance, courts should endeavor to determine which facts the expert actually used when forming the proffered opinion, rather than focusing on facts the expert subsequently learned. *Cf. Henry*, 145 N.C. App. at 217-20, 550 S.E.2d at 251-52 (Hudson, J., dissenting) (noting the court in that case refused to allow an expert to testify at trial in a manner that would have contradicted the expert's deposition testimony). To do otherwise is to admit testimony that lacks the foundation our General Assembly envisioned in enacting N.C.G.S. § 90-21.12.

Even if it were proper to ascribe greater worth to the affidavit than the deposition, Dr. Elliott's affidavit does not sufficiently demonstrate that he is familiar with the applicable standard of care. The relevant portions of that affidavit, quoted in full by Justice Hudson, baldly *assert* Dr. Elliott's familiarity with "the size of the population, the level of care available at the hospital, the facilities and the num-

ber of health care providers for obstetrics," and with the standard of care applicable to this case. The affidavit contains no specific information about the Goldsboro community or its medical facilities that would support these assertions. Our Rules of Evidence seek to prevent, as unhelpful to the trier of fact, testimony that simply speaks in the language of the applicable legal standard and thus "merely tell[s] the jury what result to reach." N.C.G.S. § 8C-1, Rule 704 official cmt. (2007). Similarly, Dr. Elliott should not be deemed competent to testify based solely on his ability to essentially parrot the standard of care language of section 90-21.12.

Neither Dr. Elliott's deposition nor his affidavit succeeded in demonstrating any nexus between, on the one hand, his experience and his minimal knowledge of Goldsboro and, on the other, the conclusion that a national standard of care including the Zavanelli maneuver was applicable in Goldsboro or any similar community. In short, any proper basis he may have had to offer an opinion that the Zavanelli maneuver was part of the standard of care applicable to Goldsboro was not clear to the court. As observed by the Court of Appeals, "neither Dr. Elliott's affidavit nor the record before this Court includes sufficient *facts*, as opposed to conclusions, to support Dr. Elliott's statements that he is familiar with the standard of care applicable in communities similar to Goldsboro, North Carolina." *Crocker v. Roethling*, 184 N.C. App. 377, 646 S.E.2d 442, 2007 WL 1928681, at *3 (2007) (unpublished). Because Dr. Elliott failed to sufficiently establish his familiarity with "the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities" as defendant Roethling at the time of Reagan's birth, *see* N.C.G.S. § 90-21.12, the trial court's ruling that he was incompetent to testify to those standards was not an abuse of discretion " 'so arbitrary that it could not have been the result of a reasoned decision,' " *N.C. Dep't of Transp. v. Haywood Cty.*, 360 N.C. at 351, 626 S.E.2d at 646 (quoting *White*, 312 N.C. at 777, 324 S.E.2d at 833).

After reviewing the trial court's exclusion of Dr. Elliott's testimony for abuse of discretion, this Court must inquire separately into the trial court's grant of summary judgment in favor of defendants. Bearing in mind that Dr. Elliott's testimony was properly deemed inadmissible and thus cannot be considered for summary judgment purposes, any competent facts asserted by the nonmoving party must be "taken as true, and their inferences must be viewed in the light most favorable to that party." *E.g., Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted).

CROCKER v. ROETHLING

[363 N.C. 140 (2009)]

Dr. Elliott's proffered testimony represented plaintiffs' only evidence of the applicable standard of care. Because Dr. Elliott was incompetent to testify on that matter, plaintiffs were unable to satisfy N.C.G.S. § 90-21.12 by offering competent proof that defendants failed to comply with the standard of care. Plaintiffs contend that even if Dr. Elliott was incompetent to testify, defendant Roethling himself admitted in his deposition that the Zavanelli maneuver was part of the standard of care applicable to this case. My review of the deposition testimony reveals that while defendant Roethling acknowledged the existence of the Zavanelli maneuver, he never stated it was part of the applicable standard of care. When the plaintiff in a medical malpractice action lacks any competent means of proving the defendant breached the applicable standard of care, the governing statute dictates that "the defendant shall not be liable." N.C.G.S. § 90-21.12. Thus, even when viewed in the light most favorable to plaintiffs, the case presented "no genuine issue as to any material fact" and defendants were "entitled to a judgment as a matter of law." *Id.* § 1A-1, Rule 56(c) (2007). The trial court properly granted summary judgment in defendants' favor.

I believe the result reached by the majority of the Court fails to give proper deference to the trial court's reasonable decision not to conduct a voir dire examination of the tendered expert witness. While I do not contend that the trial court would have been in error had it decided to hold a voir dire hearing, the facts of this case are not such as to mandate voir dire as a matter of law. The trial court committed no abuse of discretion, and its ruling should remain intact. I would affirm the judgment of the Court of Appeals and therefore respectfully dissent.

Chief Justice PARKER and Justice BRADY join in this dissenting opinion.