**CITY OF CHARLOTTE v. COMBS**

[216 N.C. App. 258 (2011)]

THE CITY OF CHARLOTTE, a Municipal Corporation, Plaintiff v. ANTHONY R. COMBS, KAREN C. COMBS, PARK MERIDIAN BANK, Beneficiary, BRYAN F. KENNEDY, III, Trustee, and any other party of interest, Defendants

No. COA11-107

(Filed 4 October 2011)

**Cities and Towns—condemnation—just compensation—temporary construction easement—valuation must include effect on remainder of property—denial of access**

The trial court erred by concluding that defendants were entitled to $5,073.00 as just compensation for the taking of their property by plaintiff City of Charlotte for a temporary construction easement based on the valuation of plaintiff's expert. When the temporary taking is in the form of a temporary construction easement, in addition to paying the fair rental value of the easement area for the time used by the condemnor, the condemnor is liable for additional elements of damages flowing from the use of the temporary construction easement. Plaintiff's expert did not conduct a complete appraisal of the property and did not take into account the impact, if any, of the denial of access. The case was remanded for a new trial.

Appeal by defendants from judgment entered 26 January 2010 by Judge Beverly T. Beal in Mecklenburg County Superior Court. Heard in the Court of Appeals 17 August 2011.

*Office of the City Attorney, by Gretchen R. Nelli, for plaintiff-appellee.*

*The Odom Law Firm, PLLC, by Thomas L. Odom, Jr. and David W. Murray, for defendants-appellants.*

HUNTER, Robert C., Judge.

Defendants Anthony R. Combs and Karen C. Combs appeal from the trial court's judgment entered on the jury's verdict that the Combs were entitled to $5,073.00 as "just compensation" for the taking of their property by plaintiff City of Charlotte for a temporary construction easement from 31 May 2007 through 13 August 2009. We agree with the Combs' main argument that the trial court erred in permitting the City's expert to give his opinion as to the value of the taking because his opinion lacked a sufficiently reliable method of proof. Consequently, we remand for a new trial.

## Facts

Since May 1999, the Combs have owned the Biberstein House in Charlotte, North Carolina. The historic property, located at 1600 Elizabeth Avenue near Presbyterian Hospital, consists of .2997 acres as well as the 4,167-square-foot house, which has been converted into an office building. The property has only one entrance, a driveway leading from Elizabeth Avenue to a secured parking lot in the rear of the property with approximately 15 parking spaces.

On 31 May 2007, the City filed a "Complaint, Declaration of Taking and Notice of Deposit and Service of Plat," notifying the Combs that the City intended to take a "temporary construction easement" ("TCE") over their property in connection with the Elizabeth Avenue Business Corridor Project. The TCE consisted of a narrow strip— approximately five feet by 66 feet (totaling 330 square feet) along the front of the Combs' property abutting Elizabeth Avenue. At the time it filed the complaint, the City planned to acquire the TCE over the Combs' property for one year and deposited $2,300.00 with the clerk of superior court as an estimate of compensation for the taking.

Almost a year later, on 30 May 2008, the Combs filed an answer in which they alleged that the taking was unconstitutional and that just compensation for the taking was "greatly in excess" of the $2,300.00 deposited by the City. On 8 June 2009, as the construction project was still ongoing, the City amended its complaint and deposited an additional $2,075.00 with the court clerk, bringing the total amount deposited to $4,375.00.

The City completed the construction project on 13 August 2009, at which time the property subject to the TCE reverted back to the Combs.[1] On 18 November 2009, the Combs moved to amend their answer to allege with more specificity the damages resulting from the TCE. The trial court granted the motion to amend on 7 December 2009.

A jury trial was conducted on 7-11 and 14 December 2009, with the sole issue being: "What amount of just compensation are Anthony and Karen Combs entitled to recover for the taking of their property by the City for temporary construction easement from May 31, 2007, to August 13, 2009[?]" Damon Bidencope, an appraiser, testified as an expert on behalf of the Combs. Believing that the TCE had a "material impact" on the entirety of the Combs' property, not just the 330

---

1. The parties agree that the takings period was 804 days, 26.5 months, or 2.2083 years.

square feet subject to the TCE, Mr. Bidencope explained that he tried to "quantify" this impact in his "analysis." As a result, Mr. Bidencope testified that the fair market rental value should be based on the entire 4,167 square feet of the property's "net rentable area" rather than just the 330 square feet encompassed by the TCE. He estimated the value of lost rental income for the Combs' property by multiplying the difference between the market rental value of the net rentable area of the property before the TCE and the market rental value of the net rentable area of the property during the taking times the number of months the property was affected by the TCE and discounting for present value. Based on this formula, Mr. Bidencope testified that, in his opinion, the "fair market value of the use by the City of the construction easement on the Combs' property and the effect on the remainder of the property outside of the construction easement" totaled approximately $103,000.00.[2]

Fitzhugh Stout, the appraiser who prepared several appraisal reports for the City regarding the Combs' property, was tendered as an expert real estate appraiser by the City. Prior to his testifying at trial, the Combs requested a *voir dire*, where Mr. Stout indicated, among other things, that he had not appraised the entire property before and after the TCE based on his experience that TCEs do not adversely affect the remainder of the property. At the conclusion of the *voir dire*, the trial court ruled, over the Combs' objection, that Mr. Stout would be allowed to give his expert opinion as to the value of the TCE. Mr. Stout then testified that he estimated the rental value of the TCE by multiplying the product of the "per square foot land value" and the area of the TCE times the annual rate of return on renting the property, and then multiplying that product by the number of years of the TCE. Mr. Stout's opinion was that the rental value of the TCE was $4,569.00, plus $220.00 for the removal of two shrubs and a 20-square-foot concrete slab, for a total valuation of $4,789.00.[3]

---

2. In his report, which was admitted at trial, Mr. Bidencope included a table setting out his calculation of the diminished value of the Combs' property during the TCE period. His figures show the following: Year 1: $19.50.00/sq. ft. (market rent before TCE)—$8.00/sq. ft. (market rent during TCE) x 4,167 sq. ft. (net rentable area) x 12 mos. = $47,921.00. Year 2: $20.09/sq. ft.—$8.00/sq. ft. x 4,167 sq. ft. x 12 mos. = $50,358.00. Year 3: $20.69/sq. ft.—$8.00/sq. ft. x 4,167 sq. ft. x 2.5 mos. = $11,014.00. After discounting for present value at 10%, Mr. Bidencope's table shows $102,803.00 as the "total[] . . . in damages over the course of the project."

3. In his calculations, Mr. Stout used $57.00 as the "per square foot land value," 330 sq. ft. as the area of the TCE, 11% as the annual rate of return, and 2.2083 years as the length of the TCE. Based on these figures, Mr. Stout determined the value of the TCE to be $4,569.00 ($57.00 x 330 sq. ft. x .11 x 2.2083 = $4,569.00), plus $220.00 for

The jury awarded the Combs $5,073.00 as just compensation for the TCE. The trial court entered judgment on the jury's verdict on 26 January 2010. The Combs moved for a new trial on 5 February 2010 and, after conducting a hearing on the motion on 1 April 2010, the trial court entered on order on 25 May 2010 denying the Combs' motion. The Combs timely appealed to this Court from the trial court's judgment and subsequent order denying their motion for a new trial.

## Temporary Takings

A "taking" is defined as " 'entering upon private property for more than a momentary period, and under warrant or color of legal authority, devoting it to a public use, or otherwise informally appropriating or injuriously affecting it in such a way as substantially to oust the owner and deprive him [or her] of all beneficial enjoyment thereof.' " *Long v. City of Charlotte*, 306 N.C. 187, 199, 293 S.E.2d 101, 109 (1982) (quoting *Penn v. Coastal Corp.*, 231 N.C. 481, 484, 57 S.E.2d 817, 819 (1950)). A " 'temporary' " taking, which "den[ies] a landowner all use of his [or her] property" for a finite period, is "no[] different in kind from [a] permanent taking[]," and requires just compensation for "the use of the land during th[e] period" of the taking. *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 318-19, 96 L. Ed. 2d 250, 266-67 (1987).

Generally, the measure of damages for a temporary taking is the "rental value of the land actually occupied" by the condemnor. *Leigh v. Garysburg Mfg. Co.*, 132 N.C. 167, 170, 43 S.E. 632, 633 (1903); *accord Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 93 L. Ed. 1765, 1773 (1949) (concluding that "the proper measure of compensation" for temporary taking "is the rental that probably could have been obtained"); *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995) (explaining that "when the Government takes property only for a period of years, . . . it essentially takes a leasehold in the property[, and] [t]hus, the value of the taking is what rental the marketplace would have yielded for the property taken"); *State v. Sun Oil Co.*, 160 N.J. Super. 513, 527, 390 A.2d 661, 668 (1978) (holding that "[w]here a temporary construction easement is taken[,]" the "rental value of the property taken is the normal measure of dam-

---

replacement of two shrubs and a concrete slab ($4,569.00 + $220.00 = $4,789.00). Mr. Bidencope, in his calculations, assessed the land value to be $60.00/sq. ft. and assumed that the TCE was 333 sq. ft. Mr. Stout, substituting Mr. Bidecope's figures into his formula, calculated the value of the TCE to be $4,853.00 ($60.00 x 333 sq. ft. x .11 x 2.2083 = $4,853.00).

ages and is awarded for the period taken"); *see 4 Nichols on Eminent Domain* § 12E.01[4] (rev. 3d ed. 2006) [hereinafter *Nichols*] (citing *Leigh* for proposition that, under North Carolina law, measure of damages for temporary taking is "fair market rental value for the period of time the property is taken"); 9 *Nichols* § G32.08[2][a] ("The most widely accepted measure of compensation for the taking of a temporary easement appears to be the rental value of the property taken.").

Where, as here, the temporary taking is in the form of a temporary construction easement, our Supreme Court has held that, in addition to paying the "[f]air rental value of [the] easement area for [the] time used by [the] condemnor," the condemnor is liable for "additional elements of damages flowing from the use of the temporary construction easement[]," which may include: (1) the "[c]ost of removal of [the] landowner's improvements from the construction easement that are paid by landowner"; (2) the "[c]ost of constructing [an] alternate entrance to [the] property"; (3) the "[c]hanges made in [the] area resulting from [the] use of [the] easement that affect [the] value of [the] area in [the] easement or [the] value of the remaining property of [the] landowner"; (4) the "[r]emoval of trees, crops, [or] improvements from [the] area in [the] easement by [the] condemnor"; and (5) the "[l]ength of time [the] easement [was] used by [the] condemnor." *Colonial Pipeline Co. v. Weaver*, 310 N.C. 93, 107, 310 S.E.2d 338, 346 (1984); *see also* 26 Am. Jur. 2d *Eminent Domain* § 283 ("Where land has been appropriated for a temporary use, the measure of compensation is the fair productive value of the property during the time in which it is held. More specifically, the rental value during the period of the taking, together with any damage sustained by the property, may be awarded as full compensation.").

## Admissibility of Expert Opinion

The Combs contend that the trial court erred by allowing Mr. Stout to give his expert opinion regarding the value of the TCE. A trial court's ruling on the admissibility of expert opinion testimony will not be reversed on appeal absent a showing that the court abused its discretion. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004). A trial court abuses its discretion where its ruling is "manifestly unsupported by reason" or is "so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

## CITY OF CHARLOTTE v. COMBS

[216 N.C. App. 258 (2011)]

Rule 702 of the Rules of Evidence provides that when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C. R. Evid. 702(a); *see State v. Evangelista*, 319 N.C. 152, 163, 353 S.E.2d 375, 383 (1987) ("Expert testimony is properly admissible when it can assist the jury in drawing certain inferences from facts and the expert is better qualified than the jury to draw such inferences."). In "considering whether to admit proffered expert testimony" under Rule 702, the trial court "conduct[s] a three-step inquiry to determine: (1) whether the expert's proffered method of proof is reliable, (2) whether the witness presenting the evidence qualifies as an expert in that area, and (3) whether the evidence is relevant." *State v. Morgan*, 359 N.C. 131, 160, 604 S.E.2d 886, 903-04 (2004), *cert. denied*, 546 U.S. 830, 163 L. Ed. 2d 79 (2005); *accord Howerton*, 358 N.C. at 458, 597 S.E.2d at 686; *State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-41 (1995). The party offering the expert testimony—in this case, the City—bears " 'the burden of tendering the qualifications of the expert' and demonstrating the propriety of the testimony under this three-step approach." *State v. Ward*, 364 N.C. 133, 140, 694 S.E.2d 738, 742 (2010) (quoting· *Crocker v. Roethling*, 363 N.C. 140, 144, 675 S.E.2d 625, 629 (2009)).

Here, the focus of the parties' dispute concerns the first step— "the reliability of [Mr. Stout]'s methodology" in valuating the TCE. *Crocker*, 363 N.C. at 144, 675 S.E.2d at 629. While our courts have recognized that "expert real estate appraisers should be given latitude in determining the value of property" in eminent domain cases, *Duke Power Co. v. Mom 'n' Pops Ham House, Inc.*, 43 N.C. App. 308, 312, 258 S.E.2d 815, 819 (1979), our courts have also cautioned that an appraiser's expert opinion must nonetheless be based on a reasonably reliable methodology, regardless of professional qualifications, *Department of Transp. v. M.M. Fowler, Inc.*, 361 N.C. 1, 6, 637 S.E.2d 885, 890 (2006). Assessment of the reliability of the appraiser's valuation methodology does not require that the appraiser's basis be "proven conclusively reliable or indisputably valid" before the appraiser is permitted to testify, *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687, but " 'mere conjecture, speculation, or surmise is not allowed by the law to be a basis of proof in respect of damages or compensation[,]' " *N.C. Dep't. of Transp. v. Haywood County*, 360 N.C. 349, 352, 626 S.E.2d 645, 647 (2006) (quoting *Raleigh, Charlotte & S. Ry. Co. v. Mecklenburg Mfg. Co.*, 169 N.C. 156, 160, 85 S.E. 390, 392 (1915)).

The Combs, relying on our Supreme Court's decision in *Haywood County*, contend that the trial court should have excluded Mr. Stout's testimony regarding his valuation of the TCE because, as his testimony on *voir dire* demonstrates, "he relied solely on his personal opinion from experience that the remainder of the property would not be affected by the construction easement without attempting to ascertain . . . the potential effects of the easement during construction[.]" In *Haywood County*, the Department of Transportation, in order to widen a highway running through Haywood County, obtained a right-of-way next to a County building situated along the highway as well as a temporary construction easement that ran parallel to the right-of-way. *Id.* at 350, 626 S.E.2d at 645-46. At trial, the County tendered three experts to give their opinions as to "the value of damages arising from the proximity of the new right of way to the building ('proximity damage') and the rental value of the temporary construction easement ('rental value')." *Id.* at 350, 626 S.E.2d at 646. All three of the appraisers testified that the County's building would depreciate in value as a result of the proximity of the right-of-way, with the appraisers' estimations of depreciation ranging from 30% to 35%. *Id.* at 351, 626 S.E.2d at 646. As for the rental value of the temporary construction easement, the appraisers "assess[ed] it at between $500.00 and $800.00 per month over a three-year period." *Id.*

When questioned about the bases for their opinions regarding the proximity damages and rental value,

> Mr. Mease's response was: "I felt like in my opinion that 30 percent damage worked well with this building." When asked, "Why isn't it 25 percent or 20 percent or 40 percent? Where does the 30 percent come from?", Mr. Mease acknowledged that he did not use any particular mathematical formula in arriving at the figure and repeated that "I just felt like that 30 percent was about what the building would be damaged . . . ." Mr. Dietz explained that his estimate that the building's value would be diminished by thirty-five percent was "my personal opinion based on experience." Although Mr. McClure said his estimate of the depreciation was derived from "my experience of dealing with the real estate," he also testified that he did not have any comparable or similar sales to document that estimate. As to the rental value of the temporary construction easement, each expert conceded that he had not seen a lease of a similar strip of property to use for a comparison in making his appraisal.

*Id.* at 351-52, 626 S.E.2d at 646-47. The transportation department moved for a directed verdict with respect to the County's evidence of proximity damages and rental value, *id.* at 350, 626 S.E.2d at 646, and the trial court granted the motion, determining that the County's experts' opinions "regarding these elements of damage were 'not based on any reliable methodology that the court could ascertain, that [they were] simply based on subjective hunches and specula-tion[,]' " *id.* at 352, 626 S.E.2d at 647. The trial court further justified its ruling, explaining:

> I'm sure [the experts] are all very well experienced and have tes-tified to their experience, but I didn't see the necessary connec-tion between their experience and how they arrived at these val-uations, particularly with respect to the proximity damage, . . . and I had the same problem with respect to rental value, the num-bers were all over the place.

*Id.*

In upholding the trial court's directed verdict, the Supreme Court addressed the reliability of the County's appraiser's method of proof, holding:

> The trial court heard the opinion of each expert as well as the basis of each opinion. Although each expert had experience in appraising real estate, none articulated any method used to arrive at his figures, even when closely questioned. To the contrary, these experts' testimony about feelings and personal opinions, unsupported by objective criteria, explains and justifies the trial court's concern that their opinions were based on hunches and speculation. Because the trial court's threshold determination that the experts' method of proof lacked sufficient reliability was neither arbitrary nor the result of an unreasoned decision, we hold that the trial court's grant of plaintiff's motion for a directed verdict was not an abuse of discretion.

*Id.* at 352-53, 626 S.E.2d at 647.

Similarly, here, when asked on *voir dire* about the "methodology" he used in formulating his valuation, Mr. Stout responded that it was his "understanding," based on his 34 years of experience as an appraiser, that "there's no reason to go through th[e] exercise" of appraising the entire property before and after a TCE because the "before" and "after" values remain "constant"; that the use of the TCE does not "adversely affect" the remainder of the property. As for the

Combs' property, although Mr. Stout acknowledged that certain "improvements" had been damaged, specifically two shrubs and a 20-square-foot slab of stamped concrete that had been removed during the construction project, his valuation did not include any assessment of whether the remainder of the Combs' property was affected in any other respect by the temporary taking.

Of particular importance in this case, although the parties dispute the length of time the Combs were prevented from accessing and using their driveway and parking lot as a result of the TCE, there is no dispute that a denial of access actually occurred. Because, however, Mr. Stout did not conduct a complete appraisal of the property, believing, based on his experience, that the TCE would not affect the remainder of the Combs' property, his valuation did not take into consideration the impact, if any, of the denial of access. The Supreme Court's decision in *Colonial Pipeline* indicates, however, that the denial of access constitutes a "[c]hange[] made in [the] area resulting from [the] use of [the] easement that affect[s] . . . [the] value of the remaining property of [the] landowner"—an "element[] of damages" that potentially may "flow[] from the use of [a] temporary construction easement[]." 310 N.C. at 107, 310 S.E.2d at 346; *see also Dep't of Transp. v. Harkey*, 308 N.C. 148, 155, 301 S.E.2d 64, 69 (1983) ("[W]hen all direct access has been eliminated, there has been *pro tanto* a taking; the availability and reasonableness of any other access goes to the question of damages and not to the question of liability for the denial of access.").

We agree with the Combs' position that

> if an expert witness appraiser, in a case where damage to the remainder is disputed, appraises the whole property, and then attributes no diminished value to the remainder because of his experience, that opinion is fundamentally different from one where the appraiser fails to conduct any appraisal of the whole property because of the fact that his experience tells him there is no adverse [a]ffect on the remainder.

In the first scenario, the appraiser's valuation is "[]supported by objective criteria," while the appraiser's valuation in the second scenario is "based on hunches and speculation." *Haywood County*, 360 N.C. at 352, 626 S.E.2d at 647.

Here, as in *Haywood County*, because Mr. Stout based his valuation of the TCE on his experience that such temporary takings do not

affect the remainder of the condemnee's property, rather than an actual assessment that the Combs' property outside of the TCE was not affected, his method of proof lacked sufficient reliability.[4] The trial court, consequently, abused its discretion in failing to exclude Mr. Stout's expert testimony regarding his valuation of the TCE. In light of the erroneously admitted expert testimony, the Combs are entitled to a new trial to determine just compensation. *See* M.M. *Fowler*, 361 N.C. at 15, 637 S.E.2d at 895 (remanding for new trial where trial court erroneously admitted evidence of lost business profits in condemnation case).

New Trial.

Judges STROUD and Robert N. HUNTER, Jr. concur.

---

4. Mr. Stout also explained on *voir dire* that not appraising the entire property served as a "cost savings to the client"—the governmental entity taking private property pursuant to the power of eminent domain. The fact that the remainder of the Combs' property was not assessed out of concerns for expediency and maximization of resources, particularly when damages to the remainder was a genuinely contested issue in the case, further undermines the reliability of Mr. Stout's valuation methodology. *See Ward*, 364 N.C. at 145, 694 S.E.2d at 745-46 (viewing expert's testimony that SBI lab used visual inspection method for identifying controlled substance, rather than chemical analysis, out of "concerns for expediency and maximizing limited laboratory resources in light of the relative seriousness of the criminal charges" as being "a technique for 'cutting corners' " and "cast[ing] an unsettling shadow of doubt on the reliability of mere visual inspection as a method of proof").